## PRUITT v. STATE OF INDIANA.

[No. 25,025.  Filed June 22, 1926.]

1. CRIMINAL LAW.—In determining the sufficiency of the evidence to sustain a verdict of guilty, an appellate tribunal is limited to the consideration of that part of the evidence which tends to prove the defendant's guilt.  p. 142.

2. HOMICIDE.—Evidence *held* to sustain conviction for murder in the first degree.  p. 142.

3. CRIMINAL LAW.—The weight of conflicting evidence is exclusively for the jury and the trial court, and not for the court on appeal.  p. 143.

4. HOMICIDE.—*Exclusion of evidence of threats and assault by third party at time of quarrel with deceased year before homicide was not error.*—In a prosecution on a charge of murder, evidence was properly excluded that, at the time the deceased committed an assault upon the accused by threatening to strike him with a board about a year before the homicide, a companion of the deceased, who was not present at the killing nor shown to have had any connection with the quarrel resulting therein, shot at the defendant and made threats against him, as it was too remote.  p. 146.

5. CRIMINAL LAW.—*Defendant's testimony as to buying the revolver with which he shot the deceased would not render admissible evidence of assault by a third person.*—In a prosecution on a charge of murder, evidence that, at a time about a year prior to the homicide, a companion of the deceased shot at the defendant and made threats against him, was not rendered admissible by the defendant's own testimony that because thereof, he bought the revolver with which he shot the deceased, where the state has offered no evidence as to when, where or how the defendant obtained the gun.  p. 146.

6. CRIMINAL LAW.—*An omission from an instruction fully covered by other instructions not reversible error.*—In a prosecution for murder, where the court gave instructions defining the crime of manslaughter, in which the jury was instructed that the killing must have been "without legal excuse or justification," the omission of such condition from the instruction defining murder was not error where the court fully instructed on the law of self-defense, and admonished the jury that if the killing was done in self-defense, the defendant could not be convicted at all.  p. 147.

From Bartholomew Circuit Court; *John W. Donaker,* Judge.

Elmer T. Pruitt was convicted of murder in the first degree, and he appeals. *Affirmed.*

*Rynerson & Long, Spaugh & Spaugh, Harry E. White, Slack & Rinier* and *L. Ert Slack,* for appellant.

*Arthur L. Gilliom,* Attorney-General and *George J. Muller,* Deputy Attorney-General, for the State.

EWBANK, J.—The defendant (appellant) was charged by indictment with having unlawfully, feloniously, purposely and with premeditated malice killed and murdered Oscar Cutsinger, at Johnson county, in the State of Indiana, on June 10, 1924, by shooting him with a revolver loaded with gun powder and balls, and thereby inflicting a mortal wound from which he died. Defendant was tried by a jury which returned a verdict finding him guilty of murder in the first degree and fixing his punishment at imprisonment for life, and judgment was rendered accordingly. His motion for a new trial for the alleged reasons that the verdict was not sustained by sufficient evidence, and that the trial court erred in excluding certain evidence and in giving certain instructions, was overruled and he excepted, and has assigned that ruling as error.

In determining whether or not a verdict of guilty is sustained by sufficient evidence, a court to which an appeal is taken is limited to the consideration of 1-3. that part of the evidence which most strongly tends to prove defendant's guilt. *Jackson* v. *State* (1924), 194 Ind. 561, 143 N. E. 625; *Wolfa* v. *State* (1926), 197 Ind. 204, 150 N. E. 98; *Faulkenburg* v. *State* (1926), 197 Ind. 491, 151 N. E. 382. There was evidence that defendant and Cutsinger, the man he killed, had disliked each other for a long time. That both kept dairies and sold milk at retail in Edinburg. That about a year before the homicide, Cutsinger had been arrested and fined for an assault committed upon

defendant, in that he had threatened to strike defendant with a board, and that he had caused defendant to be arrested on a charge of provoke. That on Wednesday before the Tuesday when the homicide was committed, defendant had told the town marshal of his dissatisfaction over Cutsinger having rented some pasture land which defendant had expected to get, and at that time had said, "G—— d—— him, I'll get him," which expression he had repeated three or four times. That, a few days before the homicide, a calf belonging to defendant had escaped from his field, and Cutsinger had caused a notice to be printed in the local newspaper stating that the calf had been taken up as an estray, and the owner could have it by paying for its feed and the cost of publishing the notice. That defendant had seen the notice on the evening before the homicide. That at 8 o'clock on the morning of June 10, 1924, defendant had stopped his milk wagon on a street in the town of Edinburg to deliver some milk, and was fixing the milk bottles in the wagon when Cutsinger came up the street in his "machine," and defendant held up his hand to stop him. That defendant and Cutsinger then had a conversation in which Cutsinger said that defendant could have it if he paid for the ad and the feed, which he said would amount to $3.50, when defendant said "Go on, I am through with you," and Cutsinger started his car. That defendant ran alongside the car as it started, striking three times with his hand, and struck Cutsinger on the shoulder, when Cutsinger stopped and got out and went behind the car. That in the conversation which followed, defendant spoke loud and angrily and told Cutsinger to "Take your hands out of your pockets, d—— you, you have a gun," when Cutsinger replied, "I have neither a gun nor a knife." That a young woman who knew them both called to them from an upstairs window not to quarrel,

and told Cutsinger to go on down town, when he turned
with "a half smile" and said "All right, Ruth," and
started toward his car. That defendant then said
something to him, when Cutsinger turned back and
with his hands on his hips slowly took two steps
toward defendant. That defendant said to him, "Wait
a minute, I want to tell you something," and then fired
a shot which struck Cutsinger in the abdomen and
lodged in the muscles of his back, when he caught at
his waistline with his hand and fell forward on his face.
Different witnesses gave the distance between them as
from six or eight feet up to thirty feet at the time the
first shot was fired, but all agreed that an appreciable
time elapsed before any other shots were heard, and
that, after Cutsinger had fallen on his face, defendant
walked over to him and fired two shots into the back
of his head. That one of these shots entered behind
the right ear and lodged just back of the left eye and
caused instant death. That Cutsinger was unarmed,
having nothing in his pockets but some milk checks and
a small pocket knife. That as defendant started away,
a woman with whom he was acquainted said to him
"Babe, what made you do that," and he answered "He
has always been looking for trouble, and now he has
it," and as defendant crossed the yard of another
woman who had seen the first shot fired and had heard
the other two shots, he said "D—— him, I told him I
would get him." Defendant testified that he had
bought the revolver with which he shot Cutsinger al-
most a year before he did the shooting, and within two
or three weeks after he and Cutsinger had the trouble
which resulted in Cutsinger being fined for commit-
ting an assault and defendant being arrested for pro-
voke, and that since then he had carried the revolver,
including many times when he had met Cutsinger.
There was also evidence that although three shots were

fired from the revolver, there were only two chambers in it that were not loaded when the marshal took it from defendant, on going over to his house after having helped to carry the dead man from the street where he fell to a lawn in front of a house opposite. This evidence, and more especially the evidence that defendant fired two shots into the back of Cutsinger's head after he had fallen on his face, sufficiently supports the verdict finding defendant guilty of murder in the first degree; and the mere fact, if it be a fact, that there was other testimony tending to support an inference that the killing was done without premeditation, is not cause for setting aside the verdict on appeal. The weight of conflicting evidence is exclusively for the jury and the trial court.

Defendant offered evidence to the effect that about twelve months before the homicide, he saw Cutsinger and a Mr. Durham standing near the corner of Holland and Main Cross streets in the town of Edinburg "eyeing" him when he went into a barber shop and again when he came out and got into his wagon and started for home; that he went south a square and there saw Cutsinger with a board six feet long and eight or ten inches wide, which had been torn from a fence, and which he held in a menacing way, and that Cutsinger then dropped the board and drew a knife from his pocket. And he also testified that about three weeks after that encounter, he bought the gun with which the homicide was committed, as was stated above, and since then had carried it in his hip pocket or on the seat of his wagon when driving "in the south end of town." Defendant offered also to prove that at the time of that encounter, just before Durham and Cutsinger started down the street from where they were "eyeing" defendant to where Cutsinger afterward had the board,

Durham said to Cutsinger, "There he goes, now is the time to get him," and that, after they had walked down the street to the corner, Durham drew a gun and shot at defendant; but each of these items of evidence was excluded. Defendant reserved an exception to each ruling, and assigned these rulings as reasons for which a new trial was asked.

The court permitted the defendant and his witnesses to testify fully concerning all that was said and done by Cutsinger at that time, and at all times before the fatal shot was fired. But Durham was not shown to have been present when the homicide was committed a year after he had made the remark and fired the shots, nor was it shown that he had anything to do with impounding the calf about which defendant and Cutsinger were quarreling at the time of the homicide, nor anything at all to do with their quarrel at that time or what led up to it. Appellant insists that the excluded evidence was competent, first, as being part of the *rest gestae* of his own quarrel with Cutsinger which he claims caused him to fear that Cutsinger would attempt to take his life, and second, as tending to explain his purchase, a few weeks later, of the gun with which Cutsinger was killed the next year. That shots for which Cutsinger was not shown in any degree to have been responsible were fired by Durham at a time when Cutsinger, himself, did acts which resulted in his being found guilty of a simple assault and fined a dollar, twelve months before the homicide, would not have tended to justify defendant in killing Cutsinger after the lapse of so long a time, in a quarrel with which Durham had nothing to do, and when he was not present. And the state having offered no evidence as to when, where or how defendant obtained the gun with which he shot Cutsinger, defendant could not make this evidence material and admissible by testi-

fying that he had bought it nearly a year before because Durham then had shot at him. Proof of statements and acts of third persons which constitute part of the *res gestae* of the homicide, itself, may sometimes be admissible. But evidence of such statements and acts at a time when the deceased merely threatened to strike defendant, a year before the quarrel began that led to the shooting, was too remote. No error was committed in excluding this evidence.

The court gave an instruction complained of by which he told the jury that, "If you find from the evidence in this cause and beyond a reasonable doubt that, 6. as charged in the indictment, the defendant unlawfully, feloniously, purposely and with premeditated malice did kill Oscar Cutsinger, in the manner charged in the indictment, then he would be guilty of murder in the first degree." Counsel for appellant admit that this was a correct statement of the law, but point to the fact that in instructions defining voluntary and involuntary manslaughter, also given by the court, the words "without legal excuse or justification" were inserted, thereby telling the jury that, "If you find from the evidence in this cause and beyond a reasonable doubt, that the defendant, *without legal excuse or justification* (our italics), did kill said Oscar Cutsinger, in the manner charged in the indictment, and that such killing was without malice," etc. (completing the definition) he would be guilty of manslaughter. And they insist that putting the qualifying phrase in the instructions which defined manslaughter, but not in the definition of murder, misled the jury into the belief that defendant might be found guilty of murder even though there may have been a legal excuse and justification for the killing. But the jury was admonished by several instructions which the court gave of its own motion that if the killing was done in self-

defense, defendant could not be convicted at all, and the court gave a series of six instructions requested by defendant, containing more than 1,200 words, in which the doctrine of self-defense was fully set out and applied to the specific facts of the case on trial. No error was committed in omitting the phrase "without legal excuse or justification" from the instruction defining the crime of murder. §§2412, 2415 Burns 1926, §§347, 350, Acts 1905 p. 584, 660.

And since it does not appear that any rights of the defendant were or could have been prejudiced by the use of those words in defining manslaughter, we decide nothing as to whether or not they made the definition of manslaughter inaccurate.

The judgment is affirmed.