# CONNOR *v.* STATE

[No. 282, September Term, 1960.]

544

*Decided June 13, 1961.*

The cause was argued before BRUNE, C. J., and HENDERSON, PRESCOTT, HORNEY and MARBURY, JJ.

*Weldon Leroy Maddox,* with whom was *Morton Edelstein* on the brief, for the appellant.

*Thomas W. Jamison, III, Assistant Attorney General,* with whom were *Thomas B. Finan, Attorney General, Saul A. Harris* and *Howard G. Reamer, State's Attorney* and *Assistant State's Attorney for Baltimore City,* respectively, on the brief, for the appellee.

HORNEY, J., delivered the opinion of the Court.

Aggrieved by his conviction of second degree murder as a result of his having run over his former wife in an automobile, the defendant, Edward Richard Connor, appealed and has assigned numerous errors with respect to the method of examining jurors on *voir dire* and in rulings on the evidence (some of which are subdivided into several parts) and in the instructions to the jury.

The defendant and the deceased had been married for many years. They had had five children, but had been divorced. At the time of the homicide—October 25, 1959— she resided in Baltimore as did the children. He resided in Camden. On the day before in a telephone conversation between them it was agreed that the defendant would come to Baltimore to attend a birthday party for one of the older daughters, that he should stay with that daughter and that he would bring $25 to his former wife. The defendant came to Baltimore in his automobile.

Upon his arrival, he and his former wife talked together on friendly terms. Thereafter, she left the house and the defendant, with several of the minor children, watched television until he went to bed in an upper room. When the former wife returned to the house about 2:00 a.m. and found him

sleeping upstairs she smacked him on the face and informed him that downstairs was good enough for him. The defendant arose immediately, dressed hurriedly, went down the back stairs, grabbed a few other things and left the house.

After the defendant had opened the door of his automobile, parked in front of the house, and had started the motor and turned on the parking lights, he saw his former wife standing at the left hand door. She demanded the $25 he had promised her and when he responded that he had no intention of giving it to her then or later, an altercation ensued as he attempted to drive slowly off while she followed alongside of the automobile and got in front of it. At this point he idled the motor long enough to tell her that he would give her the money on the next day and then, putting the automobile in gear, he again "started to move slowly" while she "insisted on staying in the same spot," but he continued to move forward about ten feet with her moving backward and still yelling for the money until there came a time when he did not "see her any more." Then he "gave it [the automobile] the gas" and moved away rapidly for about a hundred feet. In so doing— though he claimed he was not aware of it—the defendant drove over his former wife, crushed her chest and pelvis and dragged her body for at least a part of the distance he had traveled. She died at 5:40 p.m. on the same day. There was other evidence that the deceased was a heavy drinker at times, and the defendant, claiming that he was afraid of her, related the details of numerous other affrays between them in former years. But since it is not claimed that the evidence was insufficient to sustain the verdict of the jury, it is not necessary to relate more at this point. Such parts of the evidence and of the proceedings as may seem necessary to understand a question then under consideration will be set forth when and as required.

On the appeal it is claimed (i) that it was prejudicial error for the trial court to refuse to propound the questions on *voir dire* to each prospective juror separately and/or out of the presence of the other prospective jurors; (ii) that it was prejudicial error to admit the dying declaration of the

deceased as evidence; (iii) that it was error to admit the statements of the defendant to the police into the evidence (a) because the police had obtained his signature to the first statement at a time when, though it was known to the police, it was not known to the defendant that his former wife had died; and (b) because the second statement was involuntary in that it was not complete when it was given; (iv) that it was error to exclude testimony (a) as to a fifteen-year-old assault on the defendant by the deceased on the ground of remoteness; and (b) as to a conversation between a witness and the defendant on the day before the homicide on the ground that it was hearsay; (v) that it was error not to allow a psychiatrist to testify (a) as to the history taken from the defendant during an examination of him; and (b) as to the subjective symptoms of the defendant; and (vi) that the court erred (a) in refusing to instruct the jury that it could render a verdict of not guilty of murder and also of manslaughter under Code (1957), Art. 27, § 387 (manslaughter generally) but guilty of manslaughter by automobile under § 388 (of Art. 27); (b) in refusing by its instructions to distinguish between voluntary and involuntary manslaughter; and (c) in specifically instructing the jury to the effect that if it found the defendant guilty of gross negligence then its verdict must be not guilty.

(i)

The propounding of the *voir dire* questions to the prospective jurors collectively rather than separately was not improper. While this practice does not prevail in most of the counties, it has been the customary procedure in Baltimore City for many years; and, since no prejudice was shown to have resulted from the refusal of the court to examine each juror individually, we see no reason to disturb the prevailing practice. There are jurisdictions where not to propound the questions separately has been held to be reversible error. See, *e.g., Plair v. State,* 279 S. W. 267 (Tex. Crim. 1926); and see 50 C.J.S., *Juries,* § 276 c. But in other jurisdictions, the refusal to ask the *voir dire* questions individually has been upheld. See *People v. Crump,* 125 N. E. 2d 615 (Ill. 1955); *State v. Welch,* 247 Pac. 1053 (Kan. 1926); *Shively v. United*

*States,* 299 Fed. 710 (C.C.A. 9th 1924). In the absence of a statute or rule regulating the procedure, we think the matter should be left to the sound discretion of the trial court. See 5 Wharton, *Criminal Law and Procedure,* § 1964; 50 C.J.S., *supra.* While it would also be discretionary, it has never been, so far as we know, the practice anywhere in this State to examine each juror separately out of the presence of the remaining jurors.

(ii)

Early in the trial of the case, the court over objection admitted into evidence as a dying declaration [1] (but not as a part of the res gestae) a statement made by the deceased to a police officer (Horace Erwin) while she was lying in the street awaiting arrival of an ambulance. In pertinent parts the statement was as follows:

> Q. What, if anything, did Mrs. Connor, the person lying in the street say to you or to anyone in your presence? A. * * * With the information I had received [from passers by], I asked Mrs. Connor certain questions at that time.
>
> Q. Was she conscious at the time? A. Yes, sir.
>
> Q. What did you ask her and what did she answer? A. I asked Mrs. Connor: "Did your husband do this to you?"
>
> Q. What did she answer?
>
> [At this point, after counsel for the defendant had stated that the answer would be hearsay, a colloquy ensued between the prosecutor, the defense counsel and the court as to whether the statement was a part of the res gestae or a dying declaration. Thereafter, the reporter read back the answer of the

---

1. For definitions of the term "dying declaration" and statements by text writers as to the development and application of the rule, see Gorter, *Law of Evidence* (2d ed.), pp. 136-139; Jones, *Evidence,* § 301; McCormick, *Evidence,* § 258; Wharton, *Criminal Evidence,* § 297; Wigmore, *Evidence,* § 1430; Phipson, *Evidence* (9th ed.), p. 381, an English text.

witness to the penultimate question: "I asked Mrs. Connor: 'Did your husband do this to you?'"]

(The Witness.) She answered yes. I asked her at that time "Was this an accident?" This was acting on information I had received from passers-by. I asked: "Was this an accident or was it deliberate?" She answered: "It was no accident."

Prior to this testimony there had been testimony by another witness (Erwin Behlert) that he had heard the injured woman say "get a priest." There was also prior testimony by another officer (Sanford Trojan) to the effect that the woman kept saying "take care of my baby."

The claim is that the statement was neither a dying declaration nor a part of the res gestae and that the admission of the statement was prejudicial. The defendant has stated eight reasons why the declaration was inadmissible. All are without merit.

First: The deceased was fully aware of her impending death. Her anguished entreaty that someone take care of the baby plus the fact that she had called for a priest before making the declaration was strong evidence that she was aware of her condition. "It is not necessary to prove expressions implying apprehension of death, if it is clear that the person does not expect to survive the injury. This expectation may be indicated by the circumstances of [her] condition, or by [her] own acts, such as sending for a priest of [her] church, before making the declaration." 1 Wharton, *Criminal Evidence,* § 306. The text is supported by the cases. See *Carver v. United States,* 164 U. S. 694 (1897); *Hammil v. State,* 8 So. 380 (Ala. 1890); *State v. O'Brien,* 46 N. W. 752 (Ia. 1890); *Cook v. State,* 3 S. W. 749 (Tex. Crim. 1886). Nor was it necessary for the victim to state that she expected to die. It is sufficient if her condition is such (and she is aware of it) as to warrant an inference of impending death. *Hawkins v. State,* 98 Md. 355, 57 Atl. 27 (1904); *State v. Proctor,* 269 S. W. 2d 624 (Mo. 1954). See also Wharton, *op. cit.,* § 306, *supra;* 2 Jones, *Evidence,* § 301; McCormick, *Evidence,* § 259.

Second: Even if the statement was an opinion, and not a collective fact as the State suggests, the declaration was admissible. The majority rule—that "statements which amount merely to an expression of the declarant's mental impressions, estimates, opinions, and conclusions are not admissible in evidence as dying declarations if a witness could not testify in that manner in court," as stated in Wharton, *op. cit.,* § 309 —is not supported by the better reasoning, and we decline to follow it. We agree with the minority and with Professor Wigmore that the majority rule against the admission of an opinion as evidence ought not to apply to dying declarations. In 5 Wigmore, *Evidence,* § 1447, it is said:

> "The Opinion rule has no application to dying declarations. The theory of that rule * * * is that, wherever the witness can state specifically the detailed facts observed by him, the inferences to be drawn from them can equally well be drawn by the jury, so that the witness' inferences become superfluous. Now, since the declarant is here deceased, it is no longer possible to obtain from him by questions any more detailed data than his statement may contain, and hence his inferences are not in this instance superfluous, but are indispensable."

Both Virginia and Pennsylvania have accepted the Wigmore view. In *Pendleton v. Commonwealth,* 109 S. E. 201, 209 (Va. 1921), it was said that a "dying declaration is not inadmissible in evidence merely because it states a conclusion of fact." And in *Commonwealth v. Knable,* 85 A. 2d 114, 117 (Pa. 1952), there is an unequivocal statement that "the opinion rule has no application to dying declarations." See also *Commonwealth v. Plubell,* 80 A. 2d 825 (Pa. 1951), and *Commonwealth v. Perry,* 73 A. 2d 425 (Pa. 1950).[2]

---

2. For some of the cases in which it has been held that statements importing deliberation and wilfulness or statements tending to prove a collective fact are admissible, see *White v. State,* 28 S. E. 423 (Ga. 1897); *State v. Lee,* 36 S. E. 706 (S. C. 1900); *Smith v. State,* 31 So. 942 (Ala. 1902); *State v. Fielding,* 112 N. W.

Third: The dying declaration was complete and it was not improper for the court to exclude what the declarant had said with respect to the residence of her former husband and as to her continued concern over the welfare of her children. The record shows that Officer Erwin attempted to question her further as to what had actually occurred, but "she went off on a different subject." On the contrary, instead of her statement being only a part of the whole, it was all she had to say about the injury she had sustained and, as such, was all the court was required to admit as evidence. Dying declarations "are admissible only insofar as they relate to the circumstances of the killing and to the events * * * leading up to it." McCormick, *op. cit.*, § 260. See also Wigmore, *op. cit.*, § 1448.

Fourth: Instead of reflecting her mental state when she declared that the homicidal act of the defendant "was no accident," the record is clear that the declarant was merely answering a direct question as to causation. Moreover, the only evidence of her state of mind is that she was conscious when Officer Erwin was questioning her.

Fifth: Like the preceding claim, there is no evidence at all to indicate or even suggest that the declarant was not sane and rational at the time the dying declaration was made. On the contrary, since there was evidence that she was aware of her plight, it would have been improper to have excluded the declaration. The question of whether the declarant had sufficient understanding was for the jury. *Meno v. State*, 117 Md. 435, 83 Atl. 759 (1912).

Sixth: The statement by the declarant that her injuries had not been accidentally inflicted was certainly not vague or indefinite. Instead, though the statement may not have been as specific as might be desired, it was, for all its brevity, direct and to the point in response to a specific question. It was for that reason clearly admissible as evidence. Cf. *Worthington v. State*, 92 Md. 222, 48 Atl. 355 (1901). Also compare

539 (Ia. 1907); *State v. Klute*, 140 N. W. 864 (Ia. 1913); *Pippin v. Commonwealth*, 86 S. E. 152 (Va. 1915); *Finley v. State*, 244 S. W. 526 (Tex. Crim. 1922).

*Wroe v. State,* 20 Ohio St. 460 (1870); *State v. Gile,* 35 Pac. 417 (Wash. 1894).

Seventh: Even if the statement was in response to a leading question, it was clearly admissible under the rule laid down in the *Worthington* case, *supra.* In that case it was specifically held that a dying declaration may be made in answer to a leading question or even urgent solicitation. See also *Morgan v. State,* 49 S. W. 2d 788 (Tex. Crim. 1932); *Sparks v. State,* 171 Pac. 1182 (Ariz. 1918). The text writers also agree that a leading question will not vitiate a dying declaration. Jones, *op. cit.,* § 306; Wharton, *op. cit.,* § 322.

Eighth: The claim that the dying declaration was inadmissible because it invaded the province of the jury not only lacks merit but ignores the very reason why such declarations are held to be admissible in homicide cases. Since, as is pointed out in Wigmore, *op. cit.,* § 1447, *supra,* it is no longer possible to obtain from a deceased declarant the detailed facts observed by him or her, the inferences contained in the dying declaration—instead of being improper for superfluousness as the defendant in effect claims—are in fact indispensable. Moreover, since by definition a declaration made *in extremis* is admissible as evidence because the law considers that such a situation creates an obligation as solemn as that of a positive oath to tell the truth, a dying declaration if and when it is admitted becomes as much a part of the evidence to be considered by the jury as any other admitted testimony bearing on the innocence or guilt of a defendant. Clearly, the admission of the dying declaration did not impinge upon the province of the jury to decide the issue of whether the killing of the declarant was deliberate or accidental.

We agree with the trial court that the statement of the declarant was a dying declaration and that it was properly admitted as evidence. With this holding it is unnecessary to consider whether the statement was also a part of the res gestae.

(iii)

Both statements of the defendant to the police were properly admitted into evidence. As to the first statement, the

claim is that it was error for the officers taking the statement not to tell him that his former wife was dead before he signed it. The short answer to the contention is that the defendant, in testifying in his own behalf, made virtually the same statements in open court that he had made to the police in the first instance. We have consistently held that "where evidence is inadmissible but is admitted over objection, the error is harmless if the same evidence is later admitted without objection." *Bryant v. State,* 207 Md. 565, 587, 115 A. 2d 502 (1955). See also *Colie v. State,* 193 Md. 608, 69 A. 2d 497 (1949) ; *Chisley v. State,* 202 Md. 87, 95 A. 2d 577 (1953) ; *Daniels v. State,* 213 Md. 90, 131 A. 2d 267 (1957).

The basis for objecting to the admission of the second statement seems to be—since the police questioned the defendant for about an hour before the statement was actually taken down by a stenographer—that it was incomplete and hence involuntary. While we agree that where part of a statement is introduced in evidence, the remainder of it should come in also if it is shown that the part admitted was not complete, it would be unrealistic to attempt to apply that principle here. In the first place, the defendant offered nothing to show that the hour-long preliminary interview had developed anything beneficial to him that had not been included in the statement given afterward. Secondly, as a practical matter, some preliminary questioning is almost always done before a formal statement is taken, and, which is more to the point, there is nothing to show that the preliminary questioning was in fact excessive under the circumstances. Finally, there was ample testimony in the form of preliminary proof that the second statement had been freely and voluntarily made so as to allow its admission as evidence. There was no error in the admission of either statement.

(iv)

There was no error in excluding part of the testimony of the witness Eugene McCandless. The refusal to allow the witness to testify that the deceased had assaulted the defendant with a lethal weapon some fifteen years before the commission of the crime of which the defendant was convicted

was not error for the simple reason that that incident was manifestly too remote to be relevant. 1 Wharton, *op. cit.*, § 149; *Keedy v. Newcomer*, 1 Md. 241 (1851); *Md. Elec. Ry. Co. v. Beasley*, 117 Md. 270, 83 Atl. 157 (1912); *Bevans v. State*, 180 Md. 443, 24 A. 2d 792 (1942); *Pruitt v. State*, 152 N. E. 830 (Ind. 1926).

Under the circumstances, it was also not erroneous to exclude the testimony of the same witness as to a comment made by the defendant the day before the homicide was committed. The question asked was this: "Did you have any conversation with Edward Connor just prior to his coming down from New Jersey on October 25, 1959?" When the State objected, the trial court inquired as to its relevancy and as to why it was not hearsay, the defendant made no effort to answer the court's questions other than to state that it "was not hearsay." Whereupon, when the objection was renewed, the court sustained it. The ruling was not improper. In his brief on appeal, the appellant belatedly states that had an answer been permitted the witness would have testified that he (the defendant) had in effect said that he was going to see his former wife whom he would always love and felt that she still wanted him. The explanation has come too late. But, even if it is assumed that the testimony should have been admitted for the purpose of explaining the conduct and intent of the defendant on the day before the homicide, it appears that it would have had no probative force in that it did not bear directly on the state of the mind of the defendant at the time he became enraged at the actions of the deceased in blocking his effort to get away from her immediately preceding the killing. Since the defendant failed to elaborate on the relevancy of the questions and their purpose in the trial court, we think the provisions of Rule 885 bar a consideration of the contention that it was improper to sustain the objection to the question as it was propounded below.

(v)

Nor was there error in not allowing Dr. Philip E. Lerner, a psychiatrist, to testify as to the "history" and "subjective" symptoms of the defendant.

The trial court, while allowing the psychiatrist to testify as to observations made on the visit, excluded the "history" of the defendant taken at the time. The basis for the ruling as stated by the court was that "the [hearsay] rule assumes that the person who gives the history to the doctor engaged to treat him will tell the doctor the truth because he is primarily concerned with getting well. There is no such presumption in this history given to a doctor who has seen a man one time for the purpose of testifying in court." The decision in *Parker v. State,* 189 Md. 244, 55 A. 2d 784 (1947), is directly in point on this question. There it was held that the opinion of a physician based upon a "case history" given him, not by a patient for the purpose of obtaining treatment, but by a defendant for the purpose of qualifying the physician to testify as a medical expert, was properly excluded. See also 1 Wharton, *op. cit.,* § 292; 2 Jones, *op. cit.,* § 421. The cases are collected in 51 A.L.R. 2d 1051.

It was likewise proper to exclude testimony as to the "subjective" conclusions of the psychiatrist based on the complaints of the defendant. What we have said with regard to the "history" of the defendant applies with equal force to the non-objective symptoms. See Jones, *op. cit.,* § 421, *supra.*

There was no error in these rulings.

(vi)

In this case in which the defendant was charged with murder (which included common-law manslaughter) but not with manslaughter by automobile, the defendant contends that the trial court erred when it refused to instruct the jury that it could render a verdict of not guilty of murder and also of manslaughter under § 387 of Art. 27 (providing only the penalty for common-law manslaughter) but guilty of manslaughter by automobile under § 388; when it also refused to distinguish between voluntary and involuntary manslaughter; and when it instructed the jury that if it found the defendant guilty of gross negligence then its verdict must be not guilty.

The basis for all of these contentions seems to stem from an erroneous belief that a jury in a case in which a defendant

is charged with a felonious homicide (arising out of a killing by automobile) could render a verdict of guilty or not guilty, as the case might be, of manslaughter by automobile with which the accused is not charged.

The first claim is that the jury might well have desired to convict the defendant of manslaughter by automobile but could not because of the instructions given by the court. The claim is wholly without merit. In the first place, it would have been impossible for a jury to render a verdict on a nonexistent charge. Other than this, the enactment of a separate crime of manslaughter by automobile did not have the effect of abrogating the crime of common-law manslaughter —the least of the three degrees of a felonious homicide— when the killing is accomplished by intentionally running over a victim in an automobile. See *Allison v. State,* 203 Md. 1, 98 A. 2d 273 (1953). See also 8 Md. L. Rev. p. 47, 51, n. 14. Clearly, since the only function of § 387 is to prescribe the penalty, the crime of manslaughter generally is still a common-law offense. On the other hand, although it adopted the common-law standard of gross negligence as the minimum requirement to convict a defendant for an unintentional killing in the course of doing a lawful act in an unlawful manner, *Faulcon v. State,* 211 Md. 249, 126 A. 2d 858 (1956), the crime of manslaughter by automobile created by § 388 is a *separate* statutory misdemeanor.

As to the second claim, it may well be that the trial court in its instructions [3] should have distinguished between voluntary and involuntary manslaughter, but, even if we assume that it was error not to do so, it is apparent that the defendant could not have been prejudiced under the circumstances. In the first place, since the penalty statute (§ 387) makes no

---

3. Ordinarily it would appear that in a murder case a simple instruction to the effect that manslaughter is the unlawful killing of a human being *without* malice aforethought would suffice to define common-law manslaughter when the charge to the jury has also defined the other degrees of murder and the meaning of the term "malice aforethought." Cf. *Chisley v. State,* 202 Md. 87, as modified by *Davis v. State,* 204 Md. 44, and see *Bruce v. State,* 218 Md. 87.

distinction between the two, the penalty for both grades of manslaughter is the same; nor is there any distinction in the usual form of the possible verdicts in a homicide case (as to which there was no objection in this instance) between voluntary and involuntary manslaughter. Secondly, although it appears that an instruction was given as to voluntary manslaughter (a higher grade than involuntary manslaughter), the jury found the defendant guilty of murder in the second degree, a finding which clearly indicates that the jury was convinced that the defendant was guilty of a greater degree of homicide than manslaughter of either grade. Moreover, we find nothing in the record suggesting that the jury might have found a verdict of "not guilty of murder, but guilty of manslaughter" had the jury been instructed as to involuntary manslaughter.

Finally, even if that part of the instruction which informed the jury that its verdict should be not guilty if it found that the death of the victim "was the result simply of mere gross negligence," was improper, it is clear that when the instruction as given is considered with other parts of the charge, the instructions as a whole allowed the defendant far more than that to which he was entitled. Certainly it was not prejudicial, for the court in so instructing the jury in effect told it that even if the defendant was guilty of gross negligence which would warrant a conviction under § 388 (manslaughter by automobile), it was to acquit him of *all* criminal liability.

While we do not agree with all of the principles of law expressed in the instructions to the jury, we find no reversible error. When a defendant is not prejudiced thereby, the giving of an erroneous advisory instruction is not a ground for reversal. *Nicholson v. State,* 38 Md. 140 (1873); *Brown v. State,* 203 Md. 126, 100 A. 2d 7 (1953). See also 7 M. L. E., *Criminal Law,* § 788.

Finding no prejudicial errors in the rulings of the lower court, we will affirm the judgment.

*Judgment affirmed.*