# WILLIAM JOSEPH SHOTKOSKY *v.* STATE OF MARYLAND

[No. 76, September Term, 1969.]

*Decided January 27, 1970.*

The cause was argued before MURPHY, C.J., and AN-DERSON, MORTON, ORTH, and THOMPSON, JJ.

*James W. Murphy* (*Alan H. Murrell* and *Vernon G. Frame* on the brief) for appellant.

*Clarence W. Sharp, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Charles E. Moylan, Jr., State's Attorney for Baltimore City,* and *Hilary D. Caplan, Assistant State's Attorney for Baltimore City,* on the brief, for appellee.

THOMPSON, J., delivered the opinion of the Court.

William Joseph Shotkosky, the appellant, was convicted of second-degree murder in a jury trial before Judge Solomon Liss in the Criminal Court of Baltimore and sen-

tenced to a term of twenty-five years. On appeal he contends: (1) the trial court erred in denying his motion for a mistrial; (2) in not admitting expert testimony from a police officer; (3) in allowing the jury to consider first degree murder as a possible verdict; (4) in making a plain error in the instructions; and (5) in improperly excluding from the jury's consideration a statement given by a defense witness.

On Saturday, August 27, 1966, at approximately 11:30 A.M., Daniel Jerome Baker was found dead in his apartment by Harry E. Potts and Officer Edmund Welsh. Inside the victim's apartment the furnishings appeared normal without signs of a struggle or other violence. Baker's body was found face down on the living room sofa fully clothed, but without shoes and socks. His hands had been taped at the wrists behind his back; his upper arms were bound by a robe belt; his feet were bound with shoelace-type string. A handkerchief had been put in his mouth, and the mouth taped closed with adhesive tape. An electric cord was around his neck, the cord having been twisted tourniquet style about six turns. The victim's wallet, containing six dollars and various cards but no driver's license, was found apparently undisturbed in the victim's pants pocket. The body had decomposed to a significant degree. Officer Welsh and Mr. Potts found $129. in the kitchen.

Detective Cousins, who arrived later, testified substantially the same as Potts and Welsh, saying fingerprints were taken in the apartment and, along with the other physical evidence, were turned over to the laboratory. No fingerprints were admitted in evidence. A search of the victim's car parked nearby, yielded some miscellaneous articles and $121.42 in cash. On objection Cousins was not allowed to answer the cross-examination question of whether, in his opinion as an expert in homicide cases, this was a "professional" as opposed to "amateur" killing.

The body of the victim was removed to the morgue

where an autopsy was performed on Sunday, August 28, 1966 about 10:35 A.M. The description of the body at the time of the autopsy was substantially the same as that description given by Potts, Welsh and Cousins. The medical examiner testified that, except for the indentations on the neck, wrists and ankles from the ligatures, there were no marks of violence on the body, but the body was badly decomposed. Blood alcohol content was insignificant. No tests were done on the corpse for the presence of drugs. The cause of death was given as strangulation by ligature (the tightly twisted electric cord) and the gag within the mouth. Time of death was set at 48 to 96 hours before the time of the autopsy. (Calculation would place the time of death at between 10:35 A.M. on Wednesday, August 24, 1966 and 10:35 A.M. on Friday, August 26, 1966). The medical examiner testified that the death was not a suicide.

Nancy Stokes, defendant's niece, nineteen years old at the time of the crime, testified for the prosecution. After the crime but before trial, she married, and changed her name to Nancy Stokes Green.

She stated she had known the defendant for some time since he was her uncle and that previous to her moving to Baltimore in 1960, she had spent summers with him and his family. Mrs. Green testified that she was raised by her grandparents living in a house owned by the defendant. She testified her relationship with the defendant was a typical uncle-niece relationship, but the defendant seemed overly concerned about her male friends.

Mrs. Green testified that she met the victim, Baker, in March, 1966, when he came to her grandparents house to demonstrate a camera her grandfather had won in a contest. After this initial meeting, she saw the victim approximately ten times between March and August, 1966, including the times the victim gave her a ride home from work. After the first meeting, the next time she saw the victim was approximately two weeks later when he called and came by to see her. On the second date, the

victim told Nancy that he was 38 years old and had a divorce pending. She testified she never asked about his domestic situation nor visited his apartment. She described her relationship with the victim as being merely friends, and most of their social contact consisted of rides home from her job, going to movies, or visiting friends. Mrs. Green denied the victim came to visit her while she was babysitting in other people's homes, or that she secretly went out at night to meet him. She testified her last meeting with him was on August 18, 1966, when he picked her up after she had worked late. They went to Sparrow's Point for something to eat, and stopped to buy gas. While the victim was paying for the gas, he showed Nancy a photograph of herself that she had given him in April, 1966, at his request. Also at that time, she recalled seeing the victim's then current Maryland driver's license in his wallet with the photograph. She testified the victim gave her a ride home, but let her off a block from the house so as to avoid family arguments over their being together.

Mrs. Green testified that Mrs. Stokes, her grandmother with whom she was living, first protested the dating after the death of her husband (Mrs. Green's grandfather) on May 1, 1966. By this time Nancy had gone out with the victim approximately four times and the victim had visited the house several times. She said her grandmother's reasons for resisting her relationship with the victim were the victim's age and marital status. Even before her grandmother's instructions not to date the victim, Mrs. Green avoided bringing the victim to her house if she knew that Mrs. Shotkosky, the defendant's wife, was visiting since she feared arguments concerning her relationship with him.

It also appears from Mrs. Green's testimony that there had been at least two conversations between herself and the defendant over her seeing the victim. The first of these conversations occurred on an unspecified day in 1966 when the defendant asked her if she would have

an affair with him like she was with the victim. Nancy denied having such an affair with Baker. The other protest by the defendant occurred at the time of the grandfather's death on Sunday, May 1, 1966. On that day, the victim came by the grandmother's house to express his regrets, saying that he had read of the death in the paper. At that time the victim and defendant met and conversed for the first time. On the Tuesday following the grandfather's death, according to Nancy, the defendant stated that if Baker came to the grandfather's funeral he would have the victim physically ejected. Baker did not attend the funeral. After the funeral Nancy and her grandmother went to Oklahoma for a visit from early May to early July, 1966. The next time that Nancy saw the victim was in early July and four or five times thereafter.

With this background, our attention is turned to Wednesday, August 24, 1966, the last day on which the victim was seen alive and one of the possible days for the homicide. Nancy Green testified that on the evening of August 24, she and her grandmother, Mrs. Stokes, went to dinner at a neighbor's house and returned home about 5:30 or 6:00 P.M. The defendant, his wife, and their two children were present at that time or arrived soon thereafter. At approximately 6:00 or 6:15 P.M. everyone except Nancy left the house together in the defendant's car to investigate the possible sale of her grandfather's car. The group returned approximately one half hour later. At about 7:10 P.M. the defendant left the house alone. Nancy left the house approximately 7:30 and returned about 10:55 P.M. at which time Mrs. Shotkosky and the children were still waiting for the defendant's return.

On direct-examination Nancy stated she did not see the defendant after he left the grandmother's house on Wednesday evening until Thursday morning. However, on cross-examination she stated that she saw him when he returned to the grandmother's house at approximately

12:50 A.M. on Thursday, August 25, 1966. Although they did not converse they were in the same room. Nancy stated that the Shotkosky family left the grandmother's house approximately 1:30 A.M. on Thursday morning, August 25, 1966.

After arising at approximately 7:30 A.M. on Thursday, August 25, Mrs. Green testified that she answered a knock at the door, and admitted the defendant into the house. She testified that the defendant requested that she awaken the grandmother to go babysit for the Shotkosky children; instead she returned to her bedroom and continued to iron a dress to wear that day, but the defendant came from the living room into the bedroom without knocking and stood beside her while she was ironing. In this position he said "These are what I took from a friend of yours. Keep them for what they are worth." Whereupon, he laid on the ironing board the same photograph of herself and current driver's license of Daniel Jerome Baker that she had seen a week earlier in the victim's wallet, and a membership card in a sunbathing association that she had not seen before. All three items were admitted in evidence. Nancy stated the defendant then told her she would not be going to work that day, she would not be dating Baker anymore and that she, Nancy Green, did not care whose heart she was breaking. Nancy further testified that the defendant laid a pistol on the ironing board, slapped her twice in the face, and grabbed her around the neck. A struggle ensued starting in Nancy's bedroom moving into the hallway outside her bedroom, and into her grandmother's room across the hallway. During this struggle Nancy was able to extricate herself from the defendant's grip and started to run into her grandmother's room when defendant struck her on the head with the gun, causing her to be dazed but not unconscious. In this dazed state she saw the defendant with the gun fire two shots into Mrs. Stokes' room. Both Nancy and her grandmother were shouting either in pain or fright, while Nancy saw the defendant leave from the grandmother's room, into the

hallway where he tore the telephone out and then proceeded out the front door.

While Mrs. Stokes went next door to get help, Nancy returned to her own room where she put the three cards left by the defendant into her pocketbook. She was admitted to the hospital with a head cut requiring five stitches and a slight brain concussion. She did not see the defendant again until the time of trial. Mrs. Stokes became aware of the three cards when the hospital authorities turned over Nancy's personal belongings to her. On Friday, August 26, 1966, Mrs. Green spoke to the police in connection with an assault warrant sworn out by Mrs. Stokes against the defendant based on the incident of Thursday morning. During the discussion with the police, Mrs. Green stated that she told them about the three cards; the police officers told her to keep the cards and return them to their owner. Mrs. Green stated that she learned of Baker's death on Sunday, August 28, 1966, at which time she turned the three cards over to the police.

Margaret Stokes, the next witness for the State, is the grandmother of Nancy Stokes Green and the mother-in-law of the defendant. Her testimony generally corroborated that of her granddaughter, but there were some additions and some minor variations. She testified in glowing terms what a wonderful son-in-law the defendant had been before these instances in 1966. Mrs. Stokes said the defendant was infatuated with Nancy. The source of this opinion being "the way he acted with Nancy and around Nancy." She said that she spoke with the defendant about Nancy's dating the victim approximately five or ten times and that she knew that the defendant did not like the victim. Mrs. Stokes testified there had been no notices in the Sunday paper about her husband's death since he had died suddenly on Sunday afternoon, hence, the victim could not have read about the death in the Sunday paper prior to his sympathy visit.

As to the events of Wednesday, August 24, 1966, Mrs. Stokes testified Nancy was not at home when they re-

turned from the family trip, and that Nancy returned approximately 11:00 P.M. and the defendant returned exactly at 1:00 A.M. on Thursday morning August 25, 1966, by which time Nancy Green had already gone to bed. Upon defendant's return, Mrs. Stokes noticed that defendant was not wearing the same clothes that he had been wearing when he left the house earlier. When he left about 7:30 P.M., she claimed he was wearing gray slacks and a dress shirt, but when he returned about 1:00 A.M. he was wearing work pants and a plaid shirt. Mrs. Stokes testified that the defendant and his family left her house at approximately 1:30 or 1:40 A.M. on Thursday morning August 25, 1966.

Mrs. Stokes said she was awakened Thursday morning, August 25, 1966, by Nancy screaming that the defendant was beating her. Mrs. Stokes said she saw defendant, with a gun pointed in her direction, fire two shots, both of them nearly hitting her. After the defendant left, Mrs. Stokes put ice on Nancy's cut and got help from a neighbor to take her to the hospital. Mrs. Stokes testified she was given Nancy's pocketbook at the hospital and she saw the driver's license and sunbathing association card. She stated she kept these cards until Sunday, August 28, 1966, at which time she turned them over to the police at the Essex Police Station. On Thursday afternoon, August 25, 1966, she swore out a warrant for the arrest of the defendant on an assault charge based on the Thursday morning incidents.

The State next called William Thomas Werneth, Jr., who was eighteen years old at the time of the crime, and living directly below the apartment of the victim, Baker. Sometime between 9:00 and 11:00 P.M. on the evening of August 24, 1966, Werneth testified he heard someone knock on the victim's apartment door and proceed up the stairs to the apartment. He testified it sounded like two or three people were upstairs, with at least one walking around in hard-soled shoes.

Lieutenant Thomas J. McKew testified for the State as

to the extradition of defendant from St. Louis, Missouri in August, 1968.

The defendant testified in his own defense, claiming he cared for Nancy Stokes Green only as he would any relative; and denied making any statement concerning ejecting Baker from the grandfather's funeral. The defendant said that his opinions of the victim were based on reports from Mrs. Stokes and from his wife. The defendant said he did not know the victim before meeting him on May 1, 1966, did not see him again, did not know where he lived, and had never visited the victim's apartment.

As to Wednesday, August 24, 1966, the defendant testified to substantially the same events as did Mrs. Stokes and Mrs. Green; however, the defendant cited different times for the various occurrences, claiming to have arrived at his own home at 12:15 A.M. He said he spent the rest of the night at home and did not leave again until the morning.

As to the events of Thursday morning, August 25, 1966, there is considerable difference between defendant's account and that of Nancy Green. Defendant states he received a telephone call at home approximately 6:30 A.M. from Nancy requesting that he come immediately to the Stokes' residence to discuss the victim and his relationship to Mrs. Green. At the Stokes' house, Nancy Green told defendant, according to him, to stop talking to Mrs. Stokes about Nancy's dating the victim, that she, Nancy, loved Mr. Baker, and they planned to be married. Defendant was highly critical of these plans and slapped Nancy Green when she talked of marrying Baker. Nancy took a gun from her purse and pointed it at him. The defendant stated he hit Nancy on the jaw and grabbed her in an attempt to get the gun away. In the struggle, the gun discharged twice. The defendant, confused and afraid that he had possibly hurt either Nancy Green or Mrs. Stokes, left the house, wandered around town, threw the gun away in a gutter, and fled to Chicago. He denied killing Daniel Baker.

Defendant specifically denied showing the driver's license, photograph and sunbathing card to Nancy on Thursday morning, denied having them, getting them from anyone, or telling Nancy Green she would not be going to work or dating the victim again.

Mrs. Margaret Shotkosky, daughter of Mrs. Stokes and wife of the defendant, testified for the defense. Her testimony corroborated her husband's insofar as she had knowledge of the events.

Mrs. Charles Pilgrim, who lived in the apartment below the victim, also testified for the defense, saying that on Tuesday, August 23, 1966, two men came to their apartment building looking for the victim. She described these two men as one being tall with a hat and the other short and not wearing a hat; the defendant was not one of the men. In the course of Mrs. Pilgrim's five minute conversation with these men, they apparently stated their purpose for looking for the victim, Baker. However, due to objection, she was not allowed to testify whether the victim's name was mentioned in the conversation, or what the men stated as the purpose of the visit.

## I  Motion for a Mistrial

Appellant contends the trial court erred in refusing his motion for mistrial. The questioning in which the alleged error occurred is the following:

"BY MR. CAPLAN  (Assistant State's Attorney) :

"Q. Now, did Mr. Baker appear at your husband's funeral?

"A. No.

"Q. Did you learn from anyone why he had not appeared? ·

"MR. MURRELL: I object, your Honor. ·

"BY MR. CAPLAN:

"Q. Just a yes or no.

"MR. MURRELL: I object to the question.

"THE COURT: Do you know why he didn't come to the funeral, Mrs. Stokes?

"THE WITNESS: Well, I don't know exactly. Know what I heard.

"MR. MURRELL: Now, I'm going to object to anything that she might have heard, your Honor.

"THE COURT: You can't tell us what you heard. But, do you know, personally, why he didn't come? Do you know of your own knowledge?

"THE WITNESS: Well, yes. It was the—

"MR. MURRELL: Well, now, just a moment, now—please, your Honor.

"THE COURT: You can't tell us what you heard from someone else. Did you hear—

"THE WITNESS: Well, that Bill didn't want him to come to the funeral, that he was going to make trouble if he came.

"MR. MURRELL: Now, may we approach the Bench, your Honor?

"(Whereupon, a Bench-Bar Conference was held out of the presence of the jury as follows:)

"MR. MURRELL: Now, I'm going to move for a mistrial.

"THE COURT: I will deny your motion for a mistrial, Mr. Murrell. I don't think that what has been said prejudices your client to that extent. I will strike it out and tell the jury to disregard it.

"MR. MURPHY: The main thing about it, Mr. Caplan knows exactly that he is going to elicit inadmissible testimony from this witness, and he persists in it.

"THE COURT: Let me make the point, Gentlemen. It was Mr. Murrell who asked this woman who was on the stand immediately before whether or not this woman didn't tell Baker not to come to the funeral or he would be thrown out. Now, I would assume Mr. Caplan is trying to elicit the information as to whether or not

that is so, which he has a perfect right to do. Now, it is true that he started with a leading question and I have tried to assist him. The last part of what she said obviously is not admissible, and will be stricken. But, I don't see that that prejudices the defendant in any way to justify a mistrial.

"(Whereupon, the Bench-Bar Conference was concluded.)

———  ———  ———

"THE COURT: Members of the jury, you are to disregard the last statement of Mrs. Stokes' that Bill did not want him to come to the funeral or he would make trouble, since this is hearsay testimony at this point, at least, and you are not permitted to consider that in your consideration of the case; so that you will disregard it completely when you do consider the evidence in this case."

Appellant contends the above error was so basic it could not be cured by instructions from the judge to disregard the hearsay testimony. We disagree.

Both appellant and the State cite the cases defining when a motion for mistrial should be granted. *Carroll v. State,* 3 Md. App. 50, 237 A. 2d 535, *Baldwin v. State,* 5 Md. App. 22, 245 A. 2d 98, *Parker v. State,* 7 Md. App. 167, 254 A. 2d 381. Appellant also cites the Supreme Court case of *Irvin v. Dowd,* 366 U. S. 717, 81 S. Ct. 1639, 6 L.Ed.2d 751 as supporting the proposition that where prejudice is manifest, the motion for mistrial should be granted. However, even superficial comparison of the facts here to those in *Irvin* shows the two cases are not apposite.

Appellant contends the error was critical because the hearsay testimony was the only direct corroboration of Nancy Green's testimony of a threat by the appellant to the victim. It should be noted that the threat was simply to remove him from the funeral parlor—not to injure

him—and that there was other testimony indicating bad feelings by the appellant towards the victim. We have repeatedly stated, in our cases cited above and in others, that the trial judge is in the best position to judge the question of prejudice and we have refused to reverse unless the prejudice is clearly demonstrated. Not every admission of hearsay testimony requires a new trial. "A defendant is entitled to a fair trial but not a perfect one." *Lutwak v. United States*, 344 U. S. 604, 619, 73 S. Ct. 481, 490, 97 L.Ed. 593.

## II    Expert Testimony

On direct examination, Detective Furrie L. Cousins, Jr. gave a detailed description of the body of the deceased as it appeared soon after it was discovered. On cross-examination he was asked to express his opinion as an expert as to whether or not the homicide was a professional killing. Appellant alleges error, claiming the trial court abused its discretion in sustaining objections to the testimony because the evidence was reasonably calculated to assist the jury and not to confuse it under *Williams v. Dawidowicz*, 209 Md. 77, 120 A. 2d 399. We are not satisfied that the expression of an opinion on the subject would have been of sufficient value to the jury for us to find the trial judge abused his discretion. We also note the question was asked on cross-examination, the scope and extent of which are peculiarly within the discretion of the trial court. *Barger v. State*, 2 Md. App. 565, 567, 235 A. 2d 751. The testimony was not re-offered as a part of the appellant's case.

## III    First Degree Murder

Appellant next contends the trial judge erred in allowing the jury to consider first-degree murder as a possible verdict, and that the jury's verdict of murder in the second degree did not render the error harmless. He alleges *Bruce v. State*, 218 Md. 87, 145 A. 2d 428 supports the second prong of his argument, but a reading of that case shows the Court considered the trial judge's instructions

on malice, although the jury's verdict had been for manslaughter, only for guidance of the trial court on retrial. The case was being reversed on other grounds and at the time the appellant could be convicted of a higher degree of crime on retrial. *State v. Barger,* 242 Md. 616, 220 A. 2d 304 which held to the contrary was not decided until eight years later. One court faced directly with the problem held the error harmless, *State v. Cade,* 2 S.E.2d 7, 215 N. C. 393. See also *Cochran v. State,* 119 Md. 539, 552, 87 A. 400, and *Connor v. State,* 225 Md. 543, 171 A. 2d 699, 86 A.L.R.2d 892. We need not decide this issue because the evidence justified the submission of the question of a first-degree verdict to the jury. In addition to other evidence, the manner of the homicide and the intricate bindings on the victim's body would indicate willfulness, deliberation and premeditation, Md. Code, Art. 27, § 407. Perhaps the possession of the victim's cards by the appellant on Thursday morning, August 25, 1966, would support a verdict of murder in the first degree under the felony murder statute, Md. Code, Art. 27, § 410. A motion to acquit must be denied if there is any evidence legally sufficient to support a conviction. *Moore v. State,* 7 Md. App. 495, 502, 256 A. 2d 337.

IV  Plain Error in Instructions

While admitting that there was no exception at trial as required by Maryland Rule 756 f, appellant contends there was plain error in the instructions within Rule 756 g. The plain errors take two forms by appellant's interpretation: (A) The court used the terms "homicide" and "murder" interchangeably. (B) The trial judge misstated the inference that all felonious homicides are considered murder in the second degree, absent excuse, justification, or other mitigation, as set down in *Davis v. State,* 237 Md. 97, 205 A. 2d 254, *Gunther v. State,* 228 Md. 404, 179 A. 2d 880, which modified the rule expressed in *Chisley v. State,* 202 Md. 87, 95 A. 2d 577. See also *Lindsay v. State,* 8 Md. App. 100, 258 A. 2d 760.

A careful reading of the trial court's instructions show

that the terms "homicide" and "murder" were properly defined and differentiated. At page 783-84 of the transcript the trial judge said:

> "Now, homicide is the killing of a human being, and, of course, this is what happened in this case—there undoubtedly was a homicide.
>
> "Homicide can be either justifiable or excusable or felonious, and I have said that one of the words, one of the charges made against the defendant in this case is that he committed a felonious killing of a man. And if you find that he did, in fact, commit a felonious killing, then this homicide is either murder or manslaughter.
>
> "Now, murder is the unlawful or felonious killing of a human being with malice aforethought.
>
> * * *
>
> "The offense is manslaughter if the act causing death is done in the heat of passion, which passion was caused by reasonable provocation, providing the provocation was not sought or caused as an excuse for killing or inflicting hurt.
>
> "The passion must have sufficiently incensed the defendant as to temporarily suspend the influence and control of reason."

Thus, the trial judge was not using the terms "homicide" and "murder" interchangeably. Later in the instructions, when the trial judge discussed inferences as to all murder being presumed to be murder in the second degree, it was clear that the trial judge was defining murder as a felonious homicide absent excuse, justification, or mitigation and not using the terms interchangeably.

As to part (B) of this contention, appellant correctly states, as required by *Chisley, Gunther,* and *Davis, supra,* that when instructing the jury as to the inference that all felonious homicides are presumed to be murder in the second degree, the trial judge should in addition

state that the inference operates only in the absence of justification or excuse or mitigation. Appellant goes on to contend that the instructions here were deficient in that the trial judge did not state that the inference operated only in the absence of justification or excuse or mitigation. However, appellant overlooks two key points: First, as stated in *Gunther v. State,* 228 Md. at 411-12, 179 A. 2d at 884, cited with approval in *Davis v. State,* 237 Md. at 103, 205 A. 2d at 258, the limitation that the inference operates only in the absence of justification, excuse or circumstances of mitigation, need not be stated exactly in those terms. It is only necessary that the gist of the restriction be stated either in those words, or "by words to that effect." Secondly, appellant overlooks that the adequacy of instructions is determined by viewing the instructions as a whole. *Graef v. State,* 1 Md. App. 161, 228 A. 2d 480. The fact that certain parts of the instructions, taken out of context, give an inaccurate statement of the law does not make the instructions wrong, provided the instructions taken as a whole accurately state the law.

We find the instructions taken as a whole sufficiently clarify the inference of all felonious homicides being murder in the second degree, absent justification, excuse, or mitigating circumstances. Looking again to the quote from the instructions cited earlier, it is apparent that the trial judge clearly defined homicide as being *either* justifiable or excusable or felonious; further, the trial court clearly defined murder as including only felonious killings or homicides. Thereafter in the instructions when the trial judge said, "There is a presumption in this State, by Statute, that all murder is murder in the second degree," it was clear he was referring to a felonious homicide, *i.e.* a homicide in which there was no excuse, justification, or mitigation.

Viewed differently, appellant contends the instructions were so awkwardly and illogically phrased that they confused and misled the jury. It is not necessary for this

Court to decide that the instructions as given were the clearest of all possible instructions. It is sufficient that the instructions taken as a whole correctly stated the law. We find these instructions sufficiently clear. That this Court or appellant's counsel would have phrased the instructions differently is not a ground for relief. We think it significant that trial counsel with extended experience in the trial of criminal cases saw no reason to object to the instructions at the trial.

### V  Improper Exclusion of Evidence; Withholding Evidence

Appellant lastly contends that there was error by the trial court in not allowing a defense witness, Mrs. Pilgrim, to tell the jury what two unidentified men had told her was their purpose for visiting the victim's apartment the day before he was murdered. In the alternative, appellant contends that the State, having those alleged purposes recorded in a written statement taken from her, improperly withheld this potentially exculpatory evidence.

As to the trial court's exclusion of the evidence, appellant maintains that the statements by Mrs. Pilgrim would have been an exception to the hearsay rule since they were not offered as an assertion of the truth of the purposes. We are unable to review the question because there was no proffer of the expected answer and the expected answer is not apparent from the question. See *Santoni v. State*, 5 Md. App. 609, 621, 249 A. 2d 200.

Appellant contends since the State was aware of these purposes but did not reveal them to defendant that the State withheld possibly exculpatory evidence. *Giles v. Maryland*, 386 U. S. 66, 87 S. Ct. 793, 17 L.Ed.2d 737. The contention is frivolous. Mrs. Pilgrim was called as a defense witness, not as a prosecution witness. It appears defense counsel was aware of the contents of the statement but in any event the defendant had a complete opportunity to discover from Mrs. Pilgrim herself what the conversation was and its significance to the

510

trial. There is nothing to suggest she had forgotten her testimony to an extent the written statement was needed to refresh her recollection.

*Judgment affirmed, appellant to pay the costs.*