Beasley *v.* The State.

Filed Sept. 19, 1894.

———————◆———————

No. 17,288.

## BEASLEY *v.* THE STATE.

CRIMINAL LAW.—*Larceny.*—*By Husband of Wife's Money.*—Under the enabling statutes of this State the husband's interest in his wife's personal property is abolished, and he may be convicted of the larceny of her money.

SAME.—*Larceny by Trick and Artifice.*—One who obtains money or goods by some fraudulent trick or artifice, and carries them away, is guilty of larceny.

SAME.—*Facts of Case.*—For facts held sufficient to constitute larceny by a husband of his wife's money, by trick and artifice, see the opinion.

From the Pike Circuit Court.

*E. A. Ely* and *S. G. Davenport,* for appellant.

*A. G. Smith,* Attorney-General, *W. E. Cox,* Prosecuting Attorney, and *A. J. Beveridge,* for State.

Beasley v. The State.

DAILEY, J.—In this case the appellant, Alfred D. Beasley, was charged, by indictment, with the larceny of two hundred and sixty-five dollars in money, and one watch of the value of twenty-five dollars, of the goods and chattels of Ena C. Beasley, who was then his wife. The appellant moved to quash the indictment, which motion was overruled by the court, and exceptions were properly reserved by him. There was a trial by the court, and finding of guilty, and his punishment assessed at imprisonment in the State prison for six years, and a fine of five dollars.

The appellant moved for a new trial and filed his written reasons therefor, which was overruled by the court and excepted to by him. Judgment was rendered upon the finding, from which this appeal is prosecuted.

The assignment of errors presents two questions:

First. Was the verdict sustained by the evidence?

Second. Can a married man commit larceny as to the goods of his wife?

We will consume little time in the consideration of the first question. The evidence in the record presents a case against this appellant of extreme moral turpitude. From beginning to end it is fraught with shame and ignominy. On January 7, 1894, he and Ena C. Thompson were married in the State of Ohio. She was possessed of an estate of about two hundred and sixty-five dollars, consisting of money loaned, inherited from a deceased grandmother. He obtained from her a twenty-five dollar watch, induced her to collect all this money, and assisted in doing so. By his persuasion she gave him ten dollars before starting for Petersburgh, Indiana, placed fifty dollars in her dress pocket and sewed two hundred and five dollars in the lining of her skirt. When they reached Newark, O., he took the fifty dollars and insisted upon her giving him the remaining two hundred

and five dollars, under the pretense that it was not safe to carry it, and he would take it and get a draft. He paid their expenses, including their transportation out of the sixty dollars thus obtained. At Cincinnati, O., they repaired to a boarding-house, where he performed the delicate operation of cutting the skirt, from which he abstracted the two hundred and five dollars already mentioned. As an excuse for the act, he said he would buy a draft for the amount. He went up street, as he stated, for that purpose, and returned falsely informing her that he had bought one and mailed it to Petersburg. They went by boat from Cincinnati to Louisville, Ky., and the spouse engaged with others on the way in card playing until midnight. When they arrived at Louisville they went to a hotel, after which he rode out in a cab without her.

They embarked on a boat for Evansville, Indiana, and the defendant indulged his passion for playing cards during the entire trip. They put up at a hotel and registered. Thereupon he left her and was gone about the city until 12 o'clock at night. When he returned he said he was going to Henderson to stay two or three days with friends, and that she could remain in Evansville. After he had fallen asleep she took her watch and money from his clothing and concealed the money in her sleeve. When he woke the next morning he missed the watch and saw that the money was gone. He said they had been robbed, notified the landlord and called detectives. When a detective came she told the story and surrendered the money and watch to him. He advised her to keep them, and gave them back to her. They were ejected from this hotel and went to another. Appellant borrowed $5 of her upon the excuse that he wanted to pay it to one Posey, whom he owed. He went up street and bought a revolver and cartridges, returned, entered

the room his wife occupied, said he was "mad," stood with his face to the window and his back to her, loading the weapon, snapped it once or twice, said he "would not snap it any more," "the next one was loaded." The wife said "you don't need to kill me." He replied: "I may have to use it on myself." "God knows what you will do next." "I am too mad to talk about the money." "Give me that money." She gave him $5 and said, "is that enough?" and he said "no." She then gave him $10 and asked if that was enough, and he said "give me the rest." She then gave him $185, all the balance she had. He was standing with the loaded pistol in his pocket when she gave him the money. She was afraid of him; says she did not part with her money voluntarily nor of her own free will.

They left Evansville, passed through Petersburg, went to Washington, Ind., and put up at a hotel. He registered her as "Miss Thompson, Newark, O." But it seems she did not know this fact until the next morning, when she received the following infamous letter:

"OFFICE OF THE TRUSSLER HOUSE,

"HENRY KLOHR, PROP.,

"Location opposite O. & M. depot, in central section of city.

"WASHINGTON, IND., Jan. 18, 1894.

"*Ena:* Enclosed find $25 to pay your fare home. It is now 12 o'clock, and I leave in about 20 minutes for St. Louis. I lost all your money to-night on a poker game. Your board bill is paid. You are registered as Miss Thompson, of Newark, so be careful you do not say you are married. I saw mother. She would see that your trunk was expressed to you, but she did not want to see you. I join my brother Will at St. Louis. Good-bye. Yours, AL."

All this transpired during the honeymoon. It seems,

from the record, that the wife was induced to come to Indiana upon the promise that the defendant would establish their home at Petersburg so she could invest her means in a newspaper enterprise. When she was inveigled into this State, and was looted of her inheritance, the defendant was gracious enough to surrender $25 of the plunder he had taken from her, so that she might not be compelled to walk back to the State of Ohio.

The wedding tour being thus completed, and the appellant in possession of the most of his booty, the betrayed wife went to Petersburg to see his mother. Not obtaining satisfaction, she then began proceedings against him and left for her home in Ohio. While there she received from him insulting and infamous letters, too vulgar and indecent to be copied into this opinion, threatening to cover her with shame and disgrace if she did not abandon the prosecution. This is, in short, the brief, pathetic story of her wrongs. There is no denial; no palliation. But it is said there was no larceny because the money was not taken from the prosecuting witness without her consent. It is well settled that where one obtains money or goods by some fraudulent trick or artifice, and carries them away, he is guilty of larceny. Moore's and Elliott's Ind. Crim. Law, section 368, and cases there cited.

The main contention upon which appellant's counsel rely, in their able brief, is that husband and wife, living together as such, can not steal one from the other; that to constitute a valid charge of larceny, the indictment should show that at the time of the alleged crime they were living separate and apart, and that the taker then had neither the possession nor right to possession of the other's property. This is urged at great length, with liberal quotations from the common law and sacred history to the effect that husband and wife are one person,

and hence incapable of larceny one from the other. Such was the law for ages, and so remains unless overthrown by the legislative enactments of 1881, and prior thereto.

By section 5324, R. S. 1881, Burns' Rev. 1894, section 7289, marriage is declared to be a civil contract, into which males of the age of eighteen and females of the age of sixteen, not under certain disabilities therein specified, are capable of entering. The only difference between it and other contracts is that marriage is the more priceless and sacred.

By section 5115, R. S. 1881, Burns' Rev. 1894, section 6960, all the legal disabilities of married women to make contracts are abolished, except as further provided in the act of which it is a part.

Section 5117, R. S. 1881, section 6962, Burns' Rev., 1894, provides that: "A married woman may take, acquire, and hold property, real or personal, by conveyance, gift, devise, or descent, or by purchase with her separate means or money; and the same, together with all the rents, issues, income, and profits thereof, shall be and remain her own separate property, and under her own control, the same as if she were (sole and) unmarried. And she may, in her own name, as if she were unmarried, at any time during coverture, sell, barter, exchange, and convey her personal property; and she may also, in like manner, make any contracts with reference to the same," etc.

The same section also provides that "she shall be bound by an estoppel *in pais*, like any other person."

Section 5118, R. S. 1881, Burns' Rev., 1894, section 6963, binds a married woman by her covenants of title in conveyances of her separate property, as if sole, and, in like manner, as principal on her official bond.

Section 5120, R. S. 1881, Burns' Rev., 1894, section 6965, makes all married women liable for torts com-

mitted by them, and exempts the husbands from liability from the contracts or torts of their wives.

Section 5130, R. S. 1881, Burns' Rev., 1894, section 6975, vests a wife with the earnings or profits accruing from her separate trade or business.

Section 5131, R. S. 1881, Burns' Rev., 1894, section 6976, empowers her to prosecute or maintain actions in her own name against persons for damages for injuries to her person or character, the same as if she were sole; and gives her the money so recovered.

Prior to the enactment of the several sections of the statutes of this State the common law fiction prevailed of the legal unity of husband and wife. In the eye of the law they were one person, and the husband was that person.

In Blackstone's Comm., book 2, *433, the old rule is thus stated: "A sixth method of acquiring property in goods and chattels is by marriage; whereby those chattels which belonged formerly to the wife, are by act of law vested in the husband with the same degree of property and the same powers, as the wife, when sole, had over them. This depends entirely on the notion of a unity of person between husband and wife; it being held that they are one person in law, so that the entire being and existence of the woman is suspended during coverture, or entirely merged or incorporated in that of the husband. And hence it follows, that whatever personal property belonged to the wife, before marriage, absolutely vested in the husband."

The learned judge below held the indictment good upon the ground that the recent statutes give the wife exclusive control and authority over her personal property, and have greatly enlarged her personal rights as to the disposition thereof, making contracts and doing whatever a *feme sole* might do; and that the effect of such

statutes is to sever the unity of ·person and community of property heretofore existing between husband and wife. There seems to be sound logic in this position. By virtue of these beneficent statutes, a woman may hold her own property; make her own money; enter into her own contracts; pay her own debts. She may even contract with her own husband. If he defrauds her she may recover. If a woman may contract, under these statutes, with her husband and recover for a breach of contract, or for cheating her, it would seem reasonable to conclude that he may steal from her also, where the circumstances attending the wrongful act are such that if performed by another it would constitute a felonious asportation. Under the enabling statutes of Indiana the husband's interest in the wife's goods and chattels is abolished, and with its destruction the right also to fraudulently misappropriate them.

In *Garret* v. *State*, 109 Ind. 527, the defendant was indicted for burning the property of ''another person,'' to wit: The property of Hannah Garret. The evidence showed that he and his wife Hannah, the owner of the dwelling house so destroyed, occupied, used, and dwelt therein, as their habitation, and yet this court said: ''If a man unlawfully, feloniously, willfully and maliciously sets fire to and burns the dwelling house of his wife, wherein she permits him to live with her as her husband, he is guilty of the crime of arson, as such crime is defined in our statute.''

Arson, as defined in our statute, is an offense against the property, as well as the possession. Larceny is also an offense against the right of private property, and if the husband can commit the crime of arson against her private property it would seem to follow as a legal conclusion that he can also perpetrate the crime of larceny of the wife's goods.

In our opinion the judgment of the trial court should be, and it is, affirmed.

Filed Sept. 21, 1894.