## GEORGE SANTONI *v.* STATE OF MARYLAND

[No. 102, September Term, 1968.]

---

1. For a full discussion of our responsibility in reviewing sufficiency of the evidence see *Williams v. State,* 5 Md. App. 450.

610

*Decided January 15, 1969.*

The cause was argued before MURPHY, C.J., and ANDER-SON, MORTON, ORTH, and THOMPSON, JJ.

*Frank B. Cahn, II,* for appellant.

*Bernard L. Silbert, Assistant Attorney General,* with whom

were *Francis B. Burch, Attorney General,* and *Charles E. Moylan, Jr., State's Attorney for Baltimore City,* on the brief, for appellee.

MURPHY, C.J., delivered the opinion of the Court.

Appellant Santoni was charged in a two-count indictment in the Criminal Court of Baltimore with (1) larceny of $7,580.00, the money of Charles Grogan, and (2) with obtaining said money from Grogan by a false pretense. He was tried by the court sitting without a jury, found not guilty of false pretenses but guilty of grand larceny. Upon this verdict, the court sentenced the appellant to two years imprisonment under the jurisdiction of the Department of Correction. The sentence was suspended upon condition of "good behavior" and a fine of $1,000.00 was imposed. On this appeal, Santoni contends (a) that the evidence was insufficient to support the larceny conviction, and (b) that the lower court committed prejudicial error by restricting the scope of his cross-examination of the prosecuting witness.

The pertinent facts disclosed by the record are these: By an agreement written in longhand dated August 2, 1965, Joseph Wallsachs agreed to purchase the business known as the Surf Club, Inc. from Frank Stancliffe, individually, and T/A Central Auto Service and Surf Club, Inc. It was specified in the agreement that the purchase price was to be $30,000.00, of which $3,000.00 was to be paid in cash at the time of signing the agreement, with the balance of $27,000.00 being payable "at settlement," $17,000.00 in cash, and a $10,000.00 note payable five years after date, without interest. The agreement further specified that the buyer would lease the premises on which the business was being conducted for five years at a rental of $6,000.00 annually, with certain options to renew the lease and purchase the premises, and an option to require the seller to transfer all stock "held by him and others" back to the corporation. In an addendum to the agreement dated August 2, 1965, the buyer was given the right to possession of the premises upon twenty-four hours notice to the seller, with the proviso that he first purchase the liquor inventory at wholesale prices. The

entire transaction was made expressly contingent upon the successful transfer of the liquor license, and settlement was to be held five days after the transfer of the license was approved by the appropriate authorities.

The negotiations were conducted and the agreement prepared and concluded at an establishment known as the Ravens Nest in Baltimore, this apparently being the appellant Santoni's place of business. In addition to the buyer's and seller's presence, Roy Graner, the manager of the Surf Club, was also present, as well as Wallsachs's attorney Erwin Frenkil, John DiTomasso, Erwin Kardin, Santoni, and Charles Grogan, the latter being the prosecuting witness. Graner signed the agreement witnessing Stancliffe's signature; Grogan signed the agreement witnessing Wallsachs's signature. The written agreement, including the addendum thereto, was offered and received in evidence.

Stancliffe testified that he received the $3,000.00 down payment from Wallsachs when the agreement was signed and that as Wallsachs began operating the business on August 2, 1965, he was also paid $2,000.00 for the liquor inventory and $400.00 to replace cash in the cash register.

Stancliffe testified further that at the time of the signing of the agreement on August 2, 1965, Graner, the manager of the Surf Club, held an option to purchase the business, and that appellant Santoni, DiTomasso, and Kardin, had previously offered Graner $5,000.00 for his option; that when the agreement between Wallsachs and himself was signed, $5,000.00 was to be paid for Graner's option at the time of the signing; that this sum was not paid between August 2 and August 11, 1965, although he, Stancliffe, had made demand on Santoni for it, presumably on Graner's behalf; that on August 13, after he had talked with Santoni on the phone, Kardin was sent over from the Ravens Nest with $1,000.00, mostly in fifty dollar bills; that on August 14, he got a check for $1,000.00 from the Ravens Nest and three weeks later the balance of $3,000.00 was paid to him in cash by one Thomas Averella, who had been brought in by DiTomasso.[1]

---

1. Averella later demanded that the $3,000.00 be returned to him. Stancliffe signed a note for the money some six months thereafter.

Stancliffe testified that Wallsachs operated the business for ten days to two weeks, after which Kardin and DiTomasso operated it until, in October of 1965, he (Stancliffe) re-purchased the liquor stock and took back the business. He stated that the sale of the Club was never consummated; that under the agreement he was to get a first mortgage of $10,000.00, but later discovered that he was to receive only a second mortgage because "they" were taking a $20,000.00 loan from one Albert Aaron. Stancliffe testified that he kept Wallsachs's down payment of $3,000.00 "for a lot of debt that was incurred."

The prosecuting witness, Charles Grogan, testified that he had agreed to "back" Wallsachs to the extent of $10,000.00 in the event that Wallsachs purchased the Surf Club; that he was present when the agreement between Wallsachs and Stancliffe was signed on August 2, 1965 and that Frenkil (Wallsachs's attorney) "printed a check" for $3,000.00 at that time, which Wallsachs signed and gave to Stancliffe as a down payment; that on August 3, 1965, he (Grogan) went to the Surf Club and gave Frenkil $20,000.00 in the form of two checks; that the money was to be placed in escrow, to be released to Wallsachs only on Grogan's written signature, and only if Wallsachs, within ten days, or by August 13, had himself put in $10,000.00; that if Wallsachs failed to post this sum of money, the agreement between him and Wallsachs was off; and that in return for his $10,000.00 he (Grogan) was to receive a chattel mortgage on the equipment of the business, together with a life insurance policy, both in the amount of $10,000.00.

Grogan testified that on August 11, Wallsachs showed him a statement to the effect that $5,400.00 of the escrowed funds had already been spent; that this expenditure was completely without his knowledge and he did not know how the money was withdrawn from the escrow account; and that on August 11, he and Wallsachs went to see Santoni at the Ravens Nest, at which time Santoni gave Wallsachs a check for $2,000.00.[2]

Grogan testified further that on August 12 he went to Frenkil's office, apparently to make inquiry with respect to the ex-

---

**2.** The evidence fails to disclose why Santoni gave the check to Wallsachs.

penditure of the $5,400.00 of the escrow funds; that Santoni also came to Frenkil's office in response to Frenkil's phone call; that Santoni said to him, "I understand you are pulling out of the deal. I want my five grand"; that he asked Santoni "What five grand are you talking about," to which Santoni responded by saying "The five grand I paid out in payoff"; that Frenkil then arranged for him (Grogan) and Santoni to be alone in an adjacent office, at which time Santoni hold him that he "was out" another $2,500.00 which he had advanced to Wallsachs for expenses; that Santoni then said to him "You are going to loan me 7,500 bucks"; that after he (Grogan) declined, Santoni said, "You will loan it to me, you so-and-so, or your life won't be worth $75.00"; that Santoni also said "We will either get the 7,500 bucks or we won't get out of the City of Baltimore today."

Grogan further testified that at one time Kardin came into the room and he and Santoni "spent considerable time trying to get me to say Wallsachs was a thief"; that Santoni told him that Kardin "had connections with the Teamsters Union" and that "if they didn't get me today, eventually they would have a truck run me off the road and kill me"; that thereafter he (Grogan) and Santoni returned to Frenkil's office where Frenkil said,

> "I'm drawing two checks, one for seven thousand five hundred and eighty dollars and one for six thousand, nine hundred and forty dollars. You sign both of them."

He further testified that he (Grogan), in Santoni's presence, then signed the checks, which were made payable to his (Grogan's) order because Santoni "forced me to sign it" by his threats; that he told Frenkil that he didn't owe Santoni any money and had no intention of loaning him any money; that he didn't want to sign the checks because "It's nothing but fraud," but Frenkil told him "go ahead, sign them."

Grogan testified that Frenkil then went to the bank and came back with a cashier's check drawn to his order for $6,460.00 and that Frenkil "handed to Mr. Santoni in the presence of everyone three bundles of one hundred and fifty dollars bills.

which Santoni ruffled and put in his pocket"; that he didn't tell Frenkil not to give the money to Santoni; that thereafter Santoni said to him (Grogan), "I am giving you a note for this money," to which he responded by stating that he didn't want Santoni's note, that it was "no good," and that "I want money"; and that Santoni said "I will give you good juice," meaning interest.

Santoni's note to Grogan was in the amount of $9,092.00 and called for payments of $100.00 weekly. The note was signed by Santoni in Frenkil's presence.

Grogan testified that he did not know how much money Frenkil gave Santoni when he returned from the bank; that Santoni gave $500.00 in cash to Frenkil for his legal fees; that although he made demand for payment of Santoni's note on October 25, 1965 from one Manning,[3] no payments were ever made; and that he never wrote to Santoni about the note because he couldn't locate him.

On cross-examination Grogan testified that Wallsachs had executed a note to Santoni dated August 12, 1965, the amount of which was to be the same as the amount of the note executed by Santoni to Grogan. Grogan was then asked by defense counsel:

> "Q. Actually, was it not that Mr. Wallsachs was supposed to pay you back this money and you would not accept his note. Isn't that true?"

The question was objected to by the State and the court sustained the objection. No reason was given either for the State's objection or the Court's ruling, and no proffer of proof was made by appellant's counsel.

A statement made by Erwin Frenkil was received in evidence by stipulation of the parties and was substantially as follows: That Kardin, Grogan and Wallsachs "developed a transaction for the purchase of the Surf Club"; that on August 2, 1965 he drew a contract between Wallsachs and Stancliffe for the sale of the Surf Club; that the parties insisted that the

---

**3.** The record does not provide any insight into the identity of Manning.

matter had to be consummated then and there because among other reasons "an individual holding an option had to be satisfied rather promptly"; that Wallsachs gave him a blank check for the $3,000.00 down payment which, after it was filled in and signed by Wallsachs, was given to Stancliffe; that after the sellers left, Grogan, Kardin, DiTomasso and Wallsachs "discussed the matters to be taken up between them as to their respective interests, salary, personnel, etc."; that Wallsachs and Grogan were "the money people" in the transaction and they were to own one-half of the business; that Grogan gave him $20,000.00 on August 3 which was placed in his (Frenkil's) attorney escrow account; that "I was advised that $5,440.00 had been dispersed for the deposit payment, the liquor inventory and change for cash register, and was requested to make a first disbursement to Wallsachs of this amount which was done on August 4"; that on August 10, Wallsachs told him that all the money in the transaction belonged to him and that Grogan was not a real investor in the transaction, and that "papers" should be prepared to delete Grogan from the transaction; and that after "some discussion" an agreement was prepared and turned over to Wallsachs, Kardin and Santoni;[4] that on August 12, Grogan came to his office unannounced, demanding a certified check for the balance of $14,560.00 in the escrow account, claiming this to be his money; that he (Frenkil) arranged a meeting at that time with Wallsachs, Kardin, Santoni, DiTomasso, and Grogan being present; that he told them to resolve their differences and they discussed the matter out of his presence; that after some time had elapsed, he was told that Wallsachs was not to receive anything; that Grogan asked him to issue a check for $7,580.00 which he was "to turn over to Santoni, and then to issue a check for the balance to him (Grogan)"; that Frenkil then prepared two checks, one for $7,580.00 and the other for $6,940.00; that Grogan asked him to get the checks cashed and to this end, he and Grogan went to the bank together; that Grogan cashed the one check for $7,580.00, placing the money in an envelope which he put in his pocket; that

---

4. There is no evidence to indicate the terms or details of this agreement.

as to the check for $6,940.00, Grogan got $500.00 in cash for payment toward the legal fees, and a cashier's check for the remainder of $6,440.00 payable to himself; that they then returned to Frenkil's office where Grogan gave him $500.00 in cash towards his (Frenkil's) fee; that Grogan then gave $7,580.00 in cash to Santoni (of which Santoni paid $500.00 to Frenkil for legal services) ; that at no time did Grogan protest the payment arrangement with Santoni, or decline to endorse the checks, or indicate that he was under any duress; that he was then instructed to prepare a promissory note from Wallsachs to Grogan but Grogan said he didn't want Wallsachs's note; that thereafter he was directed to draw two more notes, both in the amount of $9,200.00, one from Wallsachs to Santoni and the other from Santoni to Grogan; that Wallsachs was told by both Grogan and Santoni to make check payments on his note to Grogan's order, but to mail them to Santoni; that he (Frenkil) did not understand the basis of the computations, but that it was "his general understanding that the Notes were in connection with Wallsachs making good the monies which were lost in the Surf Club transaction because of his misrepresentation to all parties, including Grogan, Kardin and counsel"; that Wallsachs acknowledged his deception, and that when Grogan left his office after the meeting had terminated he did so in company with Kardin, Wallsachs, and Santoni, with "Dr. Grogan shaking my hand, expressing regret for aggravation caused me, regret at his own ineptness in being caused his financial loss, and stating in his farewell that should he have a matter in this area again, he would like to be able to call upon me for representation."

Frenkil's stipulated testimony further indicated that Grogan had accused him of misappropriating $5,440.00, as a result of which he was indicted, but that the State entered a "Confession of not guilty" in the case.

An F.B.I. agent, Arthur Hamilton, testified that on November 17, 1965, he spoke with Santoni at the Ravens Nest in connection with an investigation he was conducting into the sale of the Surf Club;[5] that Santoni told him that in July of 1965

---

5. The record does not indicate how the F.B.I. became involved in the case.

he met Grogan and Wallsachs; that Wallsachs expressed interest in buying a business such as the Ravens Nest; that Wallsachs gave him a check for $2,000.00 as a down payment on a business known as the Quimby Room and that he (Santoni) still had that check in his possession; that because Grogan didn't like the Quimby Room, they decided to buy the Surf Club; that Graner had an option to buy the Surf Club and that DiTomasso "had arranged to have this option removed for a figure of five thousand dollars," the payment therefor to be made (a) $1,000.00 from the profits earned by the Surf Club and be paid by Kardin, (b) $1,000.00 in the form of a check from the Ravens Nest, and (c) $3,000.00 from Averella, a friend of DiTomasso, who was interested in getting him "located somewhere"; that the $7,500.00 that he (Santoni) received on August 12 was, as to $5,000.00 thereof, for Graner's option, $2,000.00 for his (Santoni's) expenses, and $500.00 for Frenkil's legal fees; and that $1,000.00 of this money was repaid to Kardin, $1,000.00 repaid to the Ravens Nest, and $3,000.00 given to Kardin and DiTomasso to return to Averella. Hamilton testified further that in response to his statement that Averella had never been repaid, Santoni said that "he knew nothing about this" but that "If we get this five thousand dollars back to Grogan, will that take care of everything?" According to Hamilton's testimony, Santoni denied that no money had been paid on account of Graner's option prior to August 11; Santoni admitted going to Frenkil's office with Wallsachs on one occasion to draw out of the escrow account a sum in excess of $5,000.00 to be placed in Wallsachs's account to cover checks Wallsachs had issued, one for $3,000.00 for the down payment on the Surf Club, and the other in payment for the liquor inventory of the Surf Club.

Santoni did not testify and no other evidence was introduced at the trial.

The lower court, in reaching its verdict, stated:

"Gentlemen, I have given very careful consideration to the evidence in this case, and the issue of credibility is the principal issue as far as the trier of the facts is concerned in this case. As counsel very candidly ad-

mitted, while it is true that one cannot view Mr. Grogan with a great deal of sympathy with all of his past dealings; were there no corroboration at all of certain elements about which he testified, the court might be inclined to reach a different conclusion. However, the testimony of Mr. Grogan concerning his conversations with Mr. Santoni, the offer of Mr. Santoni to an agent of the Federal Bureau of Investigation a sum of money, together with the question, 'Would that satisfy Mr. Grogan?' all combined together to make this court believe that Mr. Santoni is, in fact, guilty of larceny; not guilty of false pretenses."

It thus appears from the lower court's abbreviated analysis of the evidence that it predicated Santoni's guilt of larceny upon Grogan's testimony that he gave $7,580.00 to Santoni because of the latter's threats to kill or injure him if he did not do so; and that Santoni's statement to Agent Hamilton indicating a willingness to return $5,000.00 to Grogan was evidence corroborative of the criminal agency of Santoni in acquiring the money from Grogan.

Appellant contends that the "true nature of the transaction" was that Grogan was making a loan of $7,580.00 to Wallsachs so that Wallsachs could "make good the monies which were lost in the Surf Club transaction because of his [Wallsachs] misrepresentations"; and that as Grogan consented to the transaction there was no trespassory taking of the money sufficient to constitute larceny when it was turned over to Santoni.

The State contends on the other hand that there was a trespassory, non-consensual taking of the money from Grogan by Santoni based on Santoni's threats upon Grogan's life and safety; and that since Grogan didn't owe Santoni any money, the giving of the promissory note by Santoni to Grogan was an obvious ruse to lend some color of legitimacy to Santoni's criminal act.

As the record clearly indicates, a sharp conflict exists between the testimony of Grogan and the statement of Frenkil, particularly with respect to the critical events occurring on August 12 when the $7,580.00 was turned over to Santoni; and

that the lower court viewed this conflict as presenting an issue of credibility, *i.e.,* whether to believe Grogan's version of what occurred on August 12, or Frenkil's version of the transaction.

After Grogan had testified that he was compelled by threats to pay over the money to Santoni, and that he didn't want Santoni's promissory note for the money, the appellant, on cross-examination of Grogan, developed the fact that on the same day (August 12) Wallsachs had executed a promissory note payable to Santoni in the same amount as that given by Santoni to Grogan. When appellant then sought to elicit an admission from Grogan that Wallsachs was to pay the money back to him (Grogan), the court foreclosed further inquiry along this avenue by sustaining the State's objection to appellant's question.[6]

As was later shown by the statement of Frenkil, he had on August 12 prepared a note from Wallsachs to Grogan for the money Grogan had paid over to Santoni, but when Grogan refused to accept Wallsachs's note, two other notes were prepared, both in the same amount, one from Wallsachs to Santoni and the other from Santoni to Grogan, with instructions given by both Santoni and Grogan that Wallsachs, in making payments on his note, was to make his checks payable to Grogan but mail or deliver them to Santoni (indicating then the probability that Wallsachs was the primary debtor of Grogan, with Santoni also being liable, perhaps secondarily, on his note to Grogan).

As Frenkil's statement was to the effect that he didn't know the basis of the computations made on August 12 because "These people were in the habit of making their own deals and reporting only the net result that they wanted to have handled by me," it was of paramount importance to appellant's defense that he be permitted the fullest opportunity to cross-examine Grogan in an effort to develop, if he could, that in reality the transaction was a loan of money from Grogan to Wallsachs with payment thereof being made to Santoni on behalf of Wallsachs.

---

6. As heretofore set out, the question was:
   "Q. Actually, was it not that Mr. Wallsachs was supposed to pay you back this money and you would not accept his note. Isn't that true?"

We think that in view of the state of the record before us—
as unenlightening a record as we have have ever had before us
to review—that the lower court's restriction upon the scope of
appellant's cross-examination of Grogan was such as under the
circumstances constituted prejudicial error. In so concluding,
we are not unmindful of the rule that the scope of cross-exami-
nation is a matter committed to the sound discretion of the trial
court, *Plumley v. State,* 4 Md. App. 671, and that ordinarily
where, as here, no proffer was made of the answer to the ques-
tion to which the objection was sustained, there is no issue
properly before us for review, *Darby v. State,* 3 Md. App. 407,
*Bowyer v. State,* 2 Md. App. 454, and *Brown v. State,* 1 Md.
App. 571. But as the answer sought to be elicited from Grogan
by the appellant was so obvious and apparent from the ques-
tion itself (and so very vital to appellant's defense), we do not
think that a proffer of the substance of the expected answer was
necessary, *Baldwin v. State,* 226 Md. 409, 414, so that a new
trial must be granted to afford the appellant a fair opportunity
to question Grogan as to whether the $7,580.00 was in any
sense viewed by him as being a loan to Wallsachs, to be repaid
to him; and, in this connection, to inquire as to Grogan's un-
derstanding of the purpose and meaning of the promissory note
prepared on August 12 from Wallsachs to Santoni, and par-
ticularly as to his understanding of the directions purportedly
given by Santoni and himself that Wallsachs was to make pay-
ments on his note to Santoni to Grogan.[7] In view of our con-

---

7. Although neither Santoni nor Grogan were contracting parties
under the agreement for the sale of the Surf Club, it is clear that
both were intimately involved in that transaction. As there was
some evidence showing that Santoni, together with Kardin and
DiTomasso had obligated themselves to pay $5,000.00 to acquire
Graner's option on the Surf Club, and that this money was actually
paid (although after August 12), and as there was evidence to the
effect that Santoni paid $2,000.00 to Wallsachs, and $500.00 to
Frenkil for legal services rendered in connection with the transac-
tion, appellant's claim that Wallsachs was turning the money over
to him in order to "make good the monies that were lost in the
Surf Club transaction because of his (Wallsach's) misrepresenta-
tions to all parties" is not entirely without some evidentiary
foundation.

622

clusion, we need not consider the question of the sufficiency of the evidence to convict appellant of larceny. We note, however, that the indictment charged the larceny of the money itself, and not of the checks signed by Grogan on August 12 (see Maryland Code, Article 27, Section 343, and *Felkner v. State,* 218 Md. 300). To constitute larceny there must be a taking sufficient to constitute a trespass, *Loker v. State,* 2 Md. App. 1—a taking from the possession of the owner against his will, *Murray v. State,* 214 Md. 383. More specifically, larceny is the wrongful and fraudulent taking and removal of goods or chattels (including money) from the possession of another against his will with the intent to deprive the person entitled thereto of his ownership thereof. *Brown v. State,* 236 Md. 505; *Fletcher v. State,* 231 Md. 190; *Putinski v. State,* 223 Md. 1; *Robinson v. State,* 4 Md. App. 515; *Reagan v. State,* 2 Md. App. 262. Ordinarily, the taking of money or other property by putting the owner in fear of personal injury constitutes robbery, *Osborne v. State,* 4 Md. App. 57, *Harrison v. State,* 3 Md. App. 148, and may under appropriate circumstances constitute extortion in violation of Maryland Code, Article 27, Section 562 (see *Iozzi v. State,* 5 Md. App. 415). It has been held in several older cases that under some circumstances, at least, it may constitute larceny to take property from another through fear induced by threats. See *State v. Kallaher,* 39 A. 606 (Conn.); *Beasley v. State,* 38 N. E. 35 (Ind.). As stated in 32 Am. Jur. *Larceny,* Section 35, the rule is that a felonious taking with the consent of the owner, when the giving of his consent is not a voluntary act but is the result of actual fear induced by threats calculated to excite a reasonable apprehension of bodily injury is, in effect, a taking without the owner's consent and may constitute a larceny. To like effect, but with little authority cited in support of the text, see 52A C.J.S. *Larceny,* Section 23; *Wharton's Criminal Law and Procedure* (Anderson Edition), Section 507; *Perkins on Criminal Law,* page 203.

*Judgment reversed; case remanded for a new trial.*