HARRY BENSON WILLIAMS *v.* STATE OF MARYLAND

[No. 455, September Term, 1971.]

*Decided May 16, 1972.*

322

The cause was argued before MURPHY, C. J., and THOMPSON and GILBERT, JJ.

*Gerald A. Kroop* for appellant.

*James G. Klair, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Milton B. Allen, State's Attorney for Baltimore City* and *J. Thomas Caskey, Assistant State's Attorney for Baltimore City,* on the brief, for appellee.

THOMPSON, J., delivered the opinion of the Court.

Harry Benson Williams complains of his convictions for possession and control of heroin by a jury sitting in the Criminal Court of Baltimore; concurrent sentences of five years were imposed. The basis for appellant's complaint is that the trial judge committed reversible error by admitting irrelevant and prejudicial evidence at the behest of an over zealous prosecutor. We agree. In order to put the case in proper perspective, a careful review of the testimony is required.

Officer Robert Sharp testified that on May 25, 1970, he saw the appellant at about 4:40 p.m. walking south on the east side of the 1100 block of Pennsylvania Avenue in Baltimore. The officer testified that he was on routine patrol with Officer (now Detective) Thomas West and that, although both officers were in uniform, they were traveling in an unmarked radio car. At the time he observed the appellant, the latter was carrying a small carton of chocolate milk in his hand. When the appellant got alongside of the vehicle he exclaimed "Oh, God damn!" and

started running eastbound through a vacant lot. "Once he was on the lot, the chocolate milk went, little carton went. Out came the bag and Harry started spitting on the bag." The officer clarified that appellant pulled a "clear plastic baggy bag" containing white capsules from his coat pocket as he ran. After discarding the milk carton and spewing chocolate milk into the pouch, appellant dropped the pouch as he ran through the lot.

The officer gave pursuit, stopping to grab the bag and apprehended him "a good block, maybe two" away. The officer identified a proffered bag and 125 gelatin capsules, both stained with a brown material, as the pouch, and its contents, appellant had dropped. It was stipulated the capsules contained heroin hydrochloride. During the pursuit Officer Sharp had drawn his revolver because he had heard that appellant "was a shooter" and had been told that "Harry is not a man to cross." He also "didn't want any interference from the type of people that hang in that area." A search of appellant's person at the scene of his apprehension revealed neither narcotics nor a weapon; appellant was, however, in possession of $274 in U.S. currency.

On cross-examination the officer stated that he got out of the car but didn't immediately pursue the appellant until after he saw the bag; he had hesitated because 5 days earlier he and Officer West had arrested appellant and "I didn't want to seem like I was harassing him. Maybe this is what slowed me down." He further testified that on the prior occasion, the officers had recovered about 1,000 capsules from Williams and another subject. He stated that his colleague, Officer West, did not directly pursue the appellant but came up to the scene while he was holding him. Under cross-examination Officer Sharp apologized that on direct he "was going a little too fast" and said that appellant pulled the pouch not from his coat but from his "right pants pocket."

Harry Benson Williams testified in his own behalf that immediately prior to his arrest he was on his way to see

his bail bondsman with $270 received from his mother and wife to pay on a debt. He testified that he had stopped at a grocery store "just to get some cookies" and was walking alone in the 110 [1100] block of Pennsylvania Avenue. He was wearing a blue work uniform with a short sleeve shirt and no coat. He "heard this heavy noise coming up the street. I thought it was a fire engine. Light was going around. So, I stopped and when I stopped, the car pulled up like it was coming up on the curb. I looked and I heard an officer say, 'Come here, Harry.' I looked at him. I seen a gun pointing at me like this. I turned to my left and started running . . . I kept on running until he shot." He categorically denied having been in possession of the bag or the capsules, denied throwing anything on the ground, and denied that he had a container of chocolate milk.

"When I finally stopped, the first thing the officer do, he searched me . . . he started pushing me around a little bit, calling me a couple of names . . . 'I got you now, you bastard. . . . How the hell did you get out? I got your ass now.'" Another officer [West] arrived on the scene and a small crowd of people gathered. ". . . The officer that fired the gun told the officer, 'Harry don't have nothing on him,' so the [other] officer said, 'Yeah,' and went around the Avenue and come back up around through the lot and he come back up there with a bag." West confronted appellant with the bag and when he denied having possession of it called him "a damn liar." The appellant testified that about fifteen officers eventually searched the lot and in his presence "found a few daggers, a few guns, and some more narcotics."

The appellant testified that on May 20th, five days before his arrest for the instant offense, he had been arrested by the same two officers here involved. On that occasion after having been handcuffed he was thrown to the ground and beaten by Officer Sharp and Officer West had taken his glasses and "crushed them with his feet" so that he "couldn't see nothing." Appellant testified that

this recent mistreatment was his motive for running when accosted by these same two officers. For some reason this apparently relevant testimony that tended to explain his flight was stricken by the court.

On cross-examination, over almost continual objection, the witness was questioned about: his past and present employment record; his means of support, including his wife's earnings, his parents' and sisters' contribution; the amount of his bail in the present case, in the case resulting from the May 20th arrest, and in cases under other outstanding indictments; appellant was asked whether he knew Robert Lee Thompson a/k/a Pearl Street Reds, Clarence Turner a/k/a Big Ditty, Joseph Eugene Wynn a/k/a Jerry Wynn, Raymond Vernon Banks a/k/a Inky Dink, Jerry Christian and Melvin Stanford; he was asked if he frequented the area of Fulton and Baker Streets and the 1100 to 1200 block of Pennsylvania Avenue; he was asked the monetary value of his diamond rings, his watch, his coat and boots; he was asked if he was in the habit of carrying a gun, or if he owned a gun; he was asked if he had ever been convicted of a crime; if in 1964 he had been convicted of assault with intent to murder and sentenced to four years; and the Assistant State's Attorney was allowed to read into the record a formal indictment charging possession of a concealed deadly weapon under which appellant "thought" he might have been convicted.

The defense called Detective Thomas West, who testified that on May 25, he and Officer Sharp were conducting a routine patrol in a blue and white radio car with a blue dome on top and with "Police" written on the vehicle and that both officers were in uniform. The witness testified that as he was driving the vehicle his companion, Officer Sharp, observed the appellant and remarked "Here comes Harry." The witness testified that although he did not know if appellant had been convicted of any prior narcotic violations, "we knew Harry Williams to be a narcotic violator," and as a routine matter, he stopped

the automobile to observe appellant. As the car stopped a "very short distance" from appellant, he looked at the officers and said, "Oh, God damn" and began to run. Officer Sharp jumped out of the car and gave pursuit. The witness observed appellant in possession of what appeared to be a chocolate milk container and "attempting to open a baggy with his hand while running and spitting chocolate milk in the bag . . . I could see something white that was in the bag . . . I don't know if they were pills or not." The witness drove around the block in attempt to "head him off." When he next saw them, Officer Sharp had the appellant in custody. The witness testified that Officer Sharp recovered the bag in which he had previously seen "something white," and that he "never saw Officer Sharp pull a gun." After appellant's arrest, the vacant lot was searched and to the best of his knowledge "nobody else recovered anything." At the conclusion of Detective West's testimony, the defense rested.

Officer Sharp was recalled by the state as a rebuttal witness. He admitted that during the chase of appellant he had pulled his gun but denied firing it. During the rebuttal examination Officer Sharp was asked, through separate questions, whether he was familiar with Robert Lee Thompson, a/k/a Pearl Street Reds, Clarence Turner, a/k/a Big Ditty and Joseph Eugene Wynn, a/k/a Jerry Wynn.

Immediately upon the initiation of this line of questioning, appellant's attorney objected and was allowed to approach the bench. He argued that there had been no showing that such apparently collateral inquiry had any relevancy to the case. The court voiced an assumption that the Assistant State's Attorney was about to establish such relevancy. The Assistant State's Attorney pointed out that appellant denied knowing Robert Lee Thompson and that "I am prepared to prove he does know him." The court allowed the testimony saying "I think it is relevant only so far as credibility is concerned. It goes to the weight of the evidence."

Over repeated and vigorous objection, the officer was

allowed to testify that on various occasions (some over two years old) he had seen the appellant in company with each of the named individuals. The locations of such isolated sightings varied; however, they included the vicinity of Baker and Fulton Streets and the "lower end" of Pennsylvania Avenue, an area infamously known as "The Bottom" and as previously testified by Detective West, an area with an extremely high incidence of narcotics violations.

When Officer Sharp was excused, the Assistant State's Attorney requested to "take the stand myself as a final rebuttal witness . . . to the extent of seeing the rings on Mr. Williams' fingers yesterday morning before the luncheon recess in this court room." He pointed out that although the appellant admitted possessing the rings, he had testified they were in his pocket and denied having them on his fingers during the trial. Appellant's attorney suggested that if the Assistant State's Attorney wished to testify in narrative form he would agree and not require that a second Assistant State's Attorney be called for the purpose of questioning the witness. After a brief explanation to the jury that the testimony about to be heard was procedurally irregular in form, the court allowed the Assistant State's Attorney to be sworn and to testify that he observed the appellant wearing two diamond rings earlier in the trial; he described one such ring in specific detail.

The reception or rejection of evidence particularly on cross-examination is, and for very practical reasons, must be in the discretion of the trial judge. *Long v. State,* 7 Md. App. 256, 254 A. 2d 707 and *Burley v. State,* 5 Md. App. 469, 248 A. 2d 404. The cross-examination may be broad enough to permit any question which reasonably tends to explain, contradict or discredit the witness or which tends to test his accuracy, memory, veracity, character or credibility. *DeLilly v. State,* 11 Md. App. 676, 276 A. 2d 417. As pointed out in that case, however, discretion in the trial judge is not unlimited. It should also be noted that the reception or rejection of improper evidence

is not reversible error unless there is demonstrable prejudice. *Barger v. State,* 2 Md. App. 565, 235 A. 2d 751, *Duncan v. State,* 5 Md. App. 440, 248 A. 2d 176; see *Santoni v. State,* 5 Md. App. 609, 249 A. 2d 200.

In the instant case, appellant denied having possession of the narcotics involved and brought into evidence an earlier arrest by the same two police officers; he testified to certain statements tending to indicate, if believed, that the two officers were out to "get him." Appellant was improperly impeached and it is apparent that the error was not harmless.

## I Associates

The most serious error, in our view, was allowing, under the circumstances of this case, questions pertaining to persons with distinctive aliases who had received publicity indicating their involvement in the illegal narcotics trade. Although the trial judge admitted the earlier questions "subject to exception," upon the assurances of the Assistant State's Attorney that their relevancy would be shown, it soon became apparent that the only evidence the state could produce was that the appellant, on a very few occasions, over a long period of time, had been seen in the company of these individuals.[1] The state was not in a position to show a long and intimate contact with these persons. At this point the court should have declined to permit further questioning along this line, as such "evidence" to a lay jury would likely be viewed as proving a lot more than its legal worth.

To permit these convictions to stand, based in part as they are, on irrelevant and dangerously inflamatory evidence, is to permit guilt by association in its most rampant form. We have located few cases dealing directly with this subject but attempts by the state to so secure convictions have been condemned. See *Cheny v. Ohio,* 7 Ohio 222, *Ohio v. Jennings,* 166 Ohio 364, 142 N.E.2d 529;

---

1. There was no subsequent motion to strike the evidence as ordinarily required to properly preserve the issue. Rule 1085. Rule 522 d 3. *Davis v. State,* 189 Md. 269, 55 A. 2d 702. *St. Roads Comm. v. Berry,* 208 Md. 461, 118 A. 2d 649.

*People v. M'Graw,* 66 App. Div. 372, 72 N.Y.S. 679; *People v. Pettanza,* 207 N. Y. 560, 101 N. E. 428. We limit our holding to the casual associations alluded to in the instant case. We are not here concerned with a case where the accused has been shown to have been in long and intimate association with known narcotics dealers, nor under circumstances that clearly indicate that the parties were at the time and place observed, engaged in illegal activities; nor are we concerned with probable cause for an arrest. We shall later discuss the admission of the rebuttal evidence concerning these limited associations.

## II Prior Convictions

The law is well settled that a witness, including an accused, may be cross-examined about prior convictions which have some tendency to impeach his credibility. *Braxton v. State,* 11 Md. App. 435, 274 A. 2d 647; *Johnson v. State,* 9 Md. App. 166, 263 A. 2d 232; *Huber v. State,* 2 Md. App. 245, 257, 234 A. 2d 264. In *Huber, supra,* we said that this did not mean that the details of a particular crime could be shown—only the fact of the conviction. In the instant case, the appellant was asked if he was in the habit of carrying a gun. The question was in violation of the rule that while convictions may be shown, other specific acts of misconduct cannot be shown. 3A Wigmore, *Evidence,* §§ 979 & 980 (Chadbourn Ed.). See *Burley v. State,* 8 Md. App. 702, 262 A. 2d 769; *Poff v. State,* 3 Md. App. 289, 239 A. 2d 121; *White v. State,* 3 Md. App. 167, 238 A. 2d 278.

Over objection the Assistant State's Attorney read into the record the entire count of an indictment under which appellant was convicted of carrying a concealed deadly weapon. While the indictment did not reveal any particular detail of the crime, we cannot approve such a dramatic method of calling to the attention of the jury a prior crime the witness had committed. The highly formal language of the indictment could have been read by the Assistant State's Attorney only for the purpose of, through dramatic effect, improperly prejudicing the jury.

### III Finances

Appellant contends the trial court committed reversible error by permitting cross-examination as to his financial status and the financial resources of his relatives. He argues such inquiries may be relevant under some circumstances existing in other narcotics cases, but are not relevant where the only crime charged is mere possession.

The prosecution is not ordinarily permitted to refer to financial matters where they are collateral to an issue in the case. See 36 A.L.R.3d 839. Several exceptions to this rule are set forth by Professor Wigmore and others.[2] Of

2. 2 Wigmore, *Evidence*, § 392 a at 341 (3d ed., 1940) "The lack of money by A might be relevant enough to show the probability of A's desiring to commit a crime in order to obtain money. But the practical result of such a doctrine would be to put a poor person under so much unfair suspicion and at such a relative disadvantage that for reasons of fairness this argument has seldom been countenanced as evidence of the graver crimes, particularly of violence: * * * Nevertheless in cases of merely peculative crime (such as larceny or embezzlement), and in civil cases where the issue is whether the defendant borrowed money or not, the fact that he was in need of it at the time is decidedly relevant to show a probable desire to obtain it and therefore a probable borrowing or purloining; and there is here not the same objection from the standpoint of possible Unfair Prejudice:"

1 Wigmore, *Evidence*, § 154 at 601 (3d ed.) "The mere possession of a quantity of money is in icself no indication that the possessor was the taker of money charged as taken, because in general all money of the same denomination and material is alike, and the hypothesis that the money found is the same as the money taken is too forced and extraordinary to be receivable. But where the denominations of the money found and the money taken correspond in a fairly close way, the fact of the finding of that specific money would have probative value and be relevant, because the money found is fairly marked as identical with the money taken.

"Another mode, however, of making the fact of money-possession relevant is to show its sudden possession, i.e. to show that before the time of taking the person was without money, while immediately after that time he had a great deal; this reduces the hypotheses to such as involve sudden acquisition, and a dishonest acquisition thus becomes a natural and prominent hypothesis. On such conditions the possession of unidentified money becomes relevant."

1 Wigmore, *Evidence*, (3d ed.) § 32, Example 3: "The fact that A before a robbery had no money, but after it had a large sum, is offered to indicate that he by robbery became possessed of the large sum of money. There are several other possible explanations,—the receipt of a legacy, the payment of a debt, the winning of a gambling game, and the like. Nevertheless, the desired explanation

course, as always, the reception or rejection of such evidence, particularly on cross-examination, must be left in

---

rises, among other explanations, to a fair degree of plausibility, and the evidence is received.

1 Wigmore, *Evidence*, (3d ed.) § 32, Example 4: "The fact that A, charged with stealing a suit of clothes, was a poor man is offered to show him to be the thief. Now the conclusion of theft from the mere fact of poverty is, among the various possible conclusions, one of the least probable; for the conclusions that he would preferably work or beg or borrow are all equally or more probable, and the hypothesis of stealing, being also a dangerous one to adopt as the habitual construction to be put on poor men's conduct, has the double defect of being less probable and more hard upon the innocent. Such evidence, then, is seldom admitted to show that conclusion."

1 Wharton, *Criminal Evidence*, § 204 at 410-412 (12th ed.) sets forth the rules as follows: "It is relevant to prove that following the commission of the crime the defendant had possession of or attempted to dispose of specific articles of property which were identified as belonging to the victim of the crime. The possession by the defendant of large sums of money or valuable property, or the spending of large sums of money, after the commission of the crime is relevant in the prosecution of a crime which is ordinarily committed for pecuniary gain or when such gain may be incidental to the crime, when there is evidence that the defendant did not have or was not likely to have such money or property prior to the time when the offense was committed. Such evidence is admissible even though it may have a tendency of prejudicing the jury, or may indicate the commission of other crimes by the defendant.

"When money is found in the possession of the defendant, it is generally held that it is unnecessary to identify the bills of money as having been the bills which had formerly been in the possession of the victim of the crime, or to trace the source of such money.

"It had also been held that the corpus delicti must be first established before it can be shown that the defendant has money or property in his possession which it is claimed was obtained from the commission of the crime.

"It is relevant to show the manner in which the defendant kept or spent the money or property, as the inference of guilt may increase with proof that the money or property was secretively kept.

"The possession of money or property must be shown to have originated or existed at a time not too far removed from the date of the crime, or the evidence ceases to have probative value and is excluded as irrelevant. Whether the evidence is so remote as to be irrelevant depends upon all the circumstances of the case and the value of the money or property and the relative ease or difficulty of disposing of it."

The rule is stated in 91 A.L.R.2d 1042, at 1048: "It has been generally held or recognized that where a defendant is charged with a crime which is of such a nature that the acquisition of money may be regarded as a natural result of its perpetration, and there is other evidence of the accused's guilt, evidence of the defendant's sudden acquisition of money, or of a marked improvement in his financial condition at or subsequent to the time of the commission of the offense, is admissible, although the source

the sound discretion of the trial judge. 1 Jones, *Evidence,* § 159 (5th ed.) ; *Hall v. State,* 6 Md. App. 356, 251 A. 2d 219; *Cornwell v. State,* 6 Md. App. 178, 251 A. 2d 5, *De-Lilly v. State, supra.* With the exception of the reception of evidence concerning the purchase price of the clothing he was wearing at the time of the trial (treated *infra,* Note 4) we think the reception of evidence that he was without a job and attempting to establish that he was living beyond the means of his apparent limited income contributed by his relatives, was within the discretion of the trial judge. *United States v. Coduto,* 7 Cir., 284 F. 2d 464. While it is true narcotics may be possessed by an addict for his own personal use, there was evidence in the instant case to suggest that appellant was engaged in the business of distributing narcotics for pecuniary gain. It follows that one engaged in such business is more likely to be in possession of a substantial quantity of narcotics than others.[3] The fact that the evidence in the instant case failed to show an affluent style of living beyond that which the appellant as a recently physically handicapped individual might be afforded by relatives is not controlling. For all the trial judge knew at the time he permitted the questions, the answers could have been substantially different and may well have established what the prosecution was hoping to show, mainly that appellant was living in such a style that he must have been engaged in some nefarious activity to acquire the money to support such habits. The intricacies of human life are such that the logical relevance of such evidence must be left in the

of the money is not definitely traced. In some cases it has been specifically held or recognized that in order for evidence of a defendant's possession or expenditure of money to be admissible the impecunious condition of the accused prior to the time of the commission of the offense must be established. However, in other cases it has been held or recognized that evidence of a defendant's possession of a substantial sum of money after the commission of a crime, or of expenditures made by him, is relevant and admissible, even though his prior impecunious condition is not shown, but that the weight of such evidence is for the trier of fact."

3. Under *Md. Code,* Art. 27, § 286 (a) (1) the quantity of narcotics in possession may indicate an intention to distribute. This section became effective 7/1/70; the instant offense occurred prior thereto.

hands of the trial judge. It is a rare case when an appellant can show reversible error in such connection.[4]

Further pursuing the financial inquiry, the State's Attorney asked the appellant about the amount of bail he was placed on for the offense of May 20th.[5] In addition he asked about the amount of bail in the instant case but the trial judge quite properly sustained an objection thereto. He was also asked about bail on other indictments concerning assault with intent to murder, etc. The trial judge also quite properly sustained objections to this on the basis that it would tend to prove other crimes. *Cornwell, supra.* Ordinarily, sustaining objections to references to other crimes and an instruction to ignore such questions would be held to cure any harm. In the instant case, however, the questions themselves tended to prejudice the accused's case and to show the extreme length to which the prosecutor went in his attempt to secure a conviction. Although the questions did not refer to any factual circumstances, they did refer to indictments under several different numbers, which may well have been more prejudicial than if the jury had understood that all of the indictments grew out of a single transaction.

## IV Rebuttal Evidence

We have ruled that the trial judge should not have permitted cross-examination of the accused concerning his casual association with other alleged narcotics violators. It follows that rebuttal testimony on this point should not have been admitted. From the comments of the trial court and the prosecutor it appears that both labored under the misapprehension that any witness could be impeached about anything he said whether the matter had any relevancy to the instant proceedings or not. Although

---

4. Under the rule that collateral matters tending merely to disgrace or embarrass the witness without substantially contributing to the resolution of the issues involved should not be permitted, the trial judge should not have permitted the inquiries as to the value of appellant's clothing. 4 Jones, *Evidence,* §§ 919-920 (5th ed.). He did sustain objection to some of the questions.

5. Evidence of this offense had been brought out by the appellant.

the scope of examination is normally in the discretion of the trial judge, it is nonetheless error to admit rebuttal testimony to impeach a witness on collateral matters. The question is discussed in 3A Wigmore, *Evidence,* (Chadbourn Ed.) §§ 1000, 1001, 1002, 1003. See particularly the following quotation from § 1002:

> "Redfield, C. J., in *Powers v. Leach,* 26 Vt. 270, 277 (1854) : The issue attempted to be raised in regard to [Pine's] testimony was altogether collateral to the main issue in the case, and the Court might have rejected the testimony altogether and it would not have been error. We may suppose that such collateral issues might spring up in regard to the testimony of every witness upon the stand, and thus a single issue branch out into an indefinite number of subordinate and collateral ones, and these again into many more upon each point, so that it would become literally impossible ever to finish the trial of a single case. This rule, therefore, that one cannot be allowed to contradict a witness upon a matter wholly collateral to the main issue, becomes of infinite importance in the trial of cases before the jury. A judge may no doubt in his discretion allow a departure from the rule, but is not obliged to do so."

On like principle, the prosecutor should not have been permitted to testify that the appellant was wearing diamond rings the first morning of the trial. Whether he had the rings in his pocket or on his fingers had no bearing whatsoever on his guilt of the crime charged. Of course, we would not reverse for such an error in the absence of prejudice. We call attention to the error because of the trial court's and the prosecutor's misconception of the rule. Ordinarily evidence should not be admitted contradicting a statement of the witness unless either the evidence bears some direct or indirect relationship to matters to be decided at the trial, or concerns a question

affecting credibility such as a properly admissible prior conviction of crime, etc. Although it is proper to permit broad questioning on cross-examination, the witness's answers to collateral questions must usually be accepted as final. Rebuttal testimony on the point only confuses the legitimate issues of the trial. 3A Wigmore, *Evidence*, §§ 1001 and 1006 (Chadbourn Ed.); *Pearson v. State*, 182 Md. 1, 13, 31 A. 2d 624; *Harris v. State*, 237 Md. 299, 302, 206 A. 2d 254.[6]

The other issues raised by the appellant are unlikely to reoccur on retrial and therefore there is no need for us to consider them.

*Judgments reversed.*
*Case remanded for new trial.*

---

6. Although the question with respect to the admissibility of the rebuttal evidence was not properly preserved, we have nevertheless discussed it for the guidance of the trial court on retrial.